CONNECTICUT LIGHT AND POWER COMPANY *v.*
DEPARTMENT OF PUBLIC UTILITY
CONTROL ET AL.
(SC 16887)

Sullivan, C. J., and Borden, Norcott, Palmer and Zarella, Js.

Argued May 23—officially released September 30, 2003

*Robert P. Knickerbocker, Jr.*, with whom was *Scott P. Myers*, for the appellant (plaintiff).

*Tatiana D. Eirmann*, assistant attorney general, for the appellee (named defendant).

*Bruce C. Johnson*, with whom, on the brief, was *Mary J. Healey*, for the appellee (defendant office of consumer counsel).

*Opinion*

SULLIVAN, C. J. This appeal[1] by the plaintiff, Connecticut Light and Power Company, requires us to resolve two issues arising under the 1998 Electric Restructuring Act, Public Acts 1998, No. 98-28 (act). The first issue is whether the trial court properly sus-

---

[1] The plaintiff appealed to the Appellate Court and this court transferred the appeal to itself pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

tained the ruling by the defendant department of public utility control (department) that General Statutes § 16-245e (h) (4) (C),[2] which requires electric utilities to reduce their stranded costs by the amount of the net proceeds from the sale of real estate, applies to the sale of nonutility land. The second issue is whether the trial court properly sustained the department's finding that certain expenses incurred by the plaintiff did not constitute "reasonable expenses of sale" under General Statutes § 16-244f (a) (2).[3] The plaintiff also raises a number of related subsidiary claims on appeal. We affirm the judgment of the trial court.

As context for the factual history of this case and our analysis of these issues, we provide at the outset a brief overview of the relevant provisions of the act. The act brought about a major restructuring of the electric power industry to allow retail electric rates to be determined by competition. To further that purpose, the act required existing electric utilities to "unbundle" or separate electricity generation assets from electricity distribution or transmission assets either by divestiture or by transfer to legally separate corporate affiliates or divisions. See General Statutes §§ 16-244e (a) (2) and (3) and 16-244g (b).[4] Recognizing that the transition to

[2] General Statutes § 16-245e (h) (4) provides in relevant part: "After the department has calculated the total value of stranded costs for all nuclear generation assets, the department shall . . . (C) reduce such amount by the net proceeds that are above book value received by an electric company for the sale or lease of any real property after July 1, 1998."

[3] General Statutes § 16-244f (a) (2) provides: " 'Net proceeds' means the book income from the sale or divestiture of assets, consisting of sales price less reasonable expenses of sale, related income and other taxes."

[4] General Statutes § 16-244e (a) provides in relevant part: "(2) For any nonnuclear generation asset that will not be divested by January 1, 2000, unbundling and separation shall occur by transfer on a functional basis to one or more corporate affiliates that are legally separate from the company's transmission and distribution assets and all related operations and functions, in which case, no stranded costs shall be recovered.

"(3) For any nuclear generation asset that will not be sold by January 1, 2000, unbundling and separation shall occur by (A) divestiture pursuant to section 16-244g, (B) transfer on a functional basis to one or more corporate

a market based system could leave existing electric utilities with assets that were no longer economically viable, the legislature provided a means for the utilities that chose to sell their generation assets to recover from their customers the difference between the net book value of the assets under regulation and their value in the market, or their "stranded costs."[5] The legislature also directed electric utilities, however, to "mitigate [stranded] costs to the fullest extent possible" and to "[take] all reasonable steps to mitigate to the maximum extent possible the total amount of stranded

affiliates that are legally separate from the company's transmission and distribution assets and all related operations and functions, or (C) if required to comply with rules, regulations or licensing requirements of the United States Nuclear Regulatory Commission, transfer on a functional basis to one or more divisions that are structurally separate from the electric distribution company. . . ."

General Statutes § 16-244g (b) provides: "Not later than January 1, 2004, each electric distribution company shall either (1) submit its nuclear generation assets to a public auction held in a commercially reasonable manner, in accordance with subsection (c) of this section in order to divest itself of remaining nuclear generation assets, or (2) transfer remaining nuclear generation assets to one or more legally separate corporate affiliates at their book value, in which case no stranded costs shall be recovered."

[5] The trial court in its memorandum of decision quoted A. Gupta, "Tracking Stranded Costs," 21 Energy L.J. 113, 114 n.6 (2000), to the effect that "[s]tranded costs represent 'that portion of the electric company's investments in physical generation assets that is likely to become uneconomic in a competitive market. . . . Stranded investment can be characterized as a loss in the value of a utility's generation plant and equipment arising as a result of deregulation. It is measured as the difference between the net book value, under regulation, of a utility's generation assets and the value that these assets would fetch in the market.' "

The statutory scheme governing the recovery of stranded costs is extremely complex. See generally General Statutes §§ 16-245e through 16-245k. Because a full understanding of that statutory scheme is not required for purposes of this opinion, however, we see no need to provide the full text of those statutes or to engage in an extensive analysis of them. It suffices to state that stranded costs are paid largely through the issuance of " '[r]ate reduction bonds' "; General Statutes § 16-245e (a) (1); and that stranded costs not covered by the bonds are collected through an add-on to the customers' bills called a " '[c]ompetitive transition assessment' . . . ." General Statutes § 16-245e (a) (2).

costs that it seeks to claim and to minimize the cost to be recovered from customers." General Statutes § 16-245e (c) (1).[6] In furtherance of that mitigation requirement, the legislature provided that "[a]fter the department has calculated the total value of stranded costs for all nuclear generation assets, the department shall . . . (C) reduce such amount by the net proceeds that are above book value received by an electric company for the sale or lease of any real property after July 1, 1998." General Statutes § 16-245e (h) (4).

With this statutory framework in mind, we turn to a review of the relevant facts. Until 2000, the plaintiff owned two parcels of land in the city of Stamford (city). Parcel 1 consisted of approximately fourteen acres of improved land that had been used exclusively for non-utility related purposes since it was acquired by the plaintiff in 1970.[7] The land never has been included in the plaintiff's rate base.[8] Parcel 2 consisted of approximately twenty-five acres of improved utility property that was used, at one time, for gas and electric operations.

In 1987, the plaintiff entered into a purchase and sale agreement with Strand/BRC Group, Ltd. (Strand), with respect to parcel 1 and a portion of parcel 2.[9] Because

---

[6] General Statutes § 16-245e (c) (1) provides in relevant part: "Notwithstanding subdivision (1) of subsection (e) of section 16-244g, any electric company seeking to claim stranded costs shall, in accordance with this subsection, mitigate such costs to the fullest extent possible. Prior to the approval by the department of any stranded costs, the electric company shall show to the satisfaction of the department that the electric company has taken all reasonable steps to mitigate to the maximum extent possible the total amount of stranded costs that it seeks to claim and to minimize the cost to be recovered from customers. . . ."

[7] The plaintiff has a 73 percent ownership share of parcel 1. For convenience, however, we refer to the plaintiff as the owner.

[8] In other words, the costs of acquiring and maintaining parcel 1 were not supported by the rates paid by the plaintiff's customers, and the customers bore no risk of capital loss on the sale of the parcel.

[9] Strand paid the plaintiff a $550,000 deposit when it entered into the 1987 purchase and sale agreement. Although that agreement never was

of a collapse in the real estate market and opposition to the proposed sale by an adjacent landowner, the Ponus Yacht Club (yacht club), however, the purchase and sale agreement never was consummated. Instead, in 1994, the plaintiff and Strand entered into an agreement giving Strand an option to purchase the property.

In 1998, the plaintiff applied for permission to exchange portions of parcel 1 and certain rights to parcel 2 for a strip of land owned by the yacht club between the two parcels. The exchange was intended to resolve several long-standing disputes between the plaintiff and the yacht club regarding the use of their respective properties and to facilitate the future commercial development of parcel 1, which had been landlocked before the exchange. The department approved the transaction. It was concerned, however, that the exchange would decrease the value of parcel 2, which was utility property, in order to increase the value of parcel 1, which was nonutility property, thereby benefiting the plaintiff's stockholders at the expense of its customers. To compensate for this disparity, the department ordered the plaintiff to apply 25 percent of any proceeds from the sale of parcel 1 to reduce the plaintiff's nuclear stranded costs,[10] as provided by the act.

At some point, the plaintiff began to work in cooperation with the city to determine the best use for the parcels in light of the city's revitalization plans. The plaintiff and the city developed a multiuse plan for the parcels, incorporating housing, office space, a convention center and a ferry terminal. On July 1, 1999, the plaintiff issued requests for proposals to brownfield

consummated, the plaintiff retained the deposit until it sold the property to Strand in 1999.

[10] The record does not reveal the circumstances surrounding the plaintiff's divestiture of its generation facilities or the nature and amount of its stranded costs. Specific knowledge of those matters, however, is not required for purposes of this opinion.

developers. Strand submitted a proposal that the plaintiff determined to be the most compatible with the development plan and which also offered the highest cash price. Accordingly, on September 4, 2000, the plaintiff submitted to the department an application for approval of the sale of the parcels.

In connection with its approval of the plaintiff's application, the department concluded that its prior determination that the plaintiff could apportion 75 percent of the proceeds from the sale of parcel 1 to its shareholders was in error and that, pursuant to § 16-245e (h) (4), the plaintiff was required to apply all of the net proceeds above book value to reduce its stranded costs.[11] The department also determined that the plaintiff was not entitled under § 16-244f (a) (2) to reduce its net proceeds by the amount of transaction costs incurred in connection with the plaintiff's previous attempts to sell the property in 1987 and 1994, but was entitled only to "current and prior transaction costs necessary for the current sale," including costs incurred in connection with the land exchange with the yacht club. The department also disallowed $88,415 in internal labor costs as reasonable expenses of the sale on the ground that the plaintiff currently recovers those costs in rates.

The plaintiff appealed to the Superior Court from the department's decision pursuant to General Statutes § 16-35 and § 4-183 of the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq. The trial court concluded, on the bases of the plain language of § 16-245e (h) (4) (C), the entire statutory context and the statute's legislative history, that the department properly had determined that the plaintiff

[11] The department estimated that the plaintiff's net proceeds on the sale of parcel 1 would be $474,487. Under the department's previous decision in connection with the land exchange with the yacht club, 75 percent of those proceeds, or $355,865, could have been allocated to the plaintiff's shareholders.

was required to apply the entire net proceeds from the sale of parcel 1 to reduce its stranded costs. The court declined to review the plaintiff's claim that the application of the statute to nonutility land constituted a taking under the fifth amendment to the United States constitution[12] on the ground that the claim had been inadequately briefed. The court also concluded that there was substantial evidence to support the department's finding that $593,471 in costs incurred by the plaintiff in connection with the plaintiff's previous sale attempts were unrelated to the actual sale of the properties and, therefore, that the department properly had applied § 16-244f (a) (2) to disallow those costs. Finally, the court concluded that the department properly had disallowed the plaintiff's internal labor costs as reasonable costs of sale. Accordingly, the court dismissed the plaintiff's appeal. This appeal followed.

The plaintiff claims on appeal that the trial court improperly: (1) concluded that § 16-245e (h) (4) (C) applies to the sale of nonutility land; (2) declined to review its claim that such an application of the statute constitutes an unconstitutional taking; (3) concluded that expenses incurred in connection with its effort to sell the property in 1987 and 1994 were not reasonable expenses of sale under § 16-244f (a) (2); and (4) disallowed the plaintiff's internal labor costs as reasonable expenses of sale. The plaintiff also claims that, considered in its entirety, the department's ruling was "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion . . . ." General Statutes § 4-183 (j) (6). We conclude that the court properly: (1) affirmed the department's ruling that § 16-245e (h) (4) (C) applies to the sale of nonutility land; (2) declined to consider the plaintiff's

---

[12] The fifth amendment to the United States constitution provides in relevant part: "[N]or shall private property be taken for public use, without just compensation."

constitutional claim as not adequately briefed; (3) affirmed the department's ruling disallowing expenses incurred in connection with previous efforts to sell the property; and (4) affirmed the department's ruling disallowing internal labor costs. We also conclude that the court properly determined that the department's decision was not arbitrary and capricious.

I

## THE APPLICATION OF § 16-245e (h) (4) (C) TO NONUTILITY LAND

We first address the plaintiff's claims that the trial court improperly: (1) affirmed the department's ruling that § 16-245e (h) (4) (C) applies to nonutility land; and (2) refused to consider the plaintiff's claim that such an application violates the takings clause of the fifth amendment. We disagree with both claims.

A

Whether § 16-245e (h) (4) (C) applies to nonutility land is a matter of statutory interpretation presenting a pure question of law. See *Morrison* v. *Parker*, 261 Conn. 545, 548, 804 A.2d 777 (2002). We have recognized that "[a]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . We have determined, therefore, that the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . ." (Internal quotation marks omitted.) *Schiano* v. *Bliss Exterminating Co.*, 260

Conn. 21, 33–34, 792 A.2d 835 (2002). Section 16-245e (h) (4) (C) has not previously been subject to judicial scrutiny. Accordingly, our review is de novo.

Section 16-245e (h) (4) provides in relevant part that "[a]fter the department has calculated the total value of stranded costs for all nuclear generation assets, the department shall . . . (C) reduce such amount by the net proceeds that are above book value received by an electric company for the sale or lease of *any* real property after July 1, 1998." (Emphasis added.) Thus, on its face, the statute does not distinguish between utility and nonutility land, but would appear to apply to all land sales. The plaintiff argues, however, that the statute does not apply to the sale of nonutility land because the word "any" as used therein is ambiguous and, therefore, the statute does not expressly abrogate the general rate-making principle that customers who have not borne the costs or risks associated with ownership of nonutility property are not entitled to the proceeds from the sale of the property.[13] See *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control,* 219 Conn. 51, 69–70, 591 A.2d 1231 (1991) (stating in dicta that gains on sale of utility owned land that was never included in rate base belong to shareholders); see also *Rumbin* v. *Utica Mutual Ins. Co.,* 254 Conn. 259, 265, 757 A.2d 526 (2000) ("[a]lthough the legislature may eliminate a common law right by statute, the presumption that the legislature does not have such a purpose can be overcome only if the legislative intent is clearly and plainly expressed" [internal quotation marks omit-

---

[13] The plaintiff characterizes this rule as being grounded in the common law. Without necessarily agreeing with the plaintiff's characterization, we conclude that the rule is rooted in traditional notions of justice; see *Democratic Central Committee of the District of Columbia* v. *Washington Metropolitan Area Transit Commission,* 485 F.2d 786, 806 (D.C. Cir. 1973) ("justice inherent in [this rule] is self-evident"); and, accordingly, the principle that a statute is presumed not to have abrogated the common law is applicable.

ted]). In support of its argument, the plaintiff relies on a line of cases in which this court has recognized that "[t]he word 'any' has a diversity of meanings and may be employed to indicate 'all' or 'every' as well as 'some' or 'one.' . . . Its meaning in a given statute depends upon the context and subject matter of the statute. . . . To find the sense in which it is employed . . . we must look at the wording of the statute, its legislative history and its basic policy." (Citations omitted.) *Muller* v. *Town Plan & Zoning Commission*, 145 Conn. 325, 328–29, 142 A.2d 524 (1958); see also *Stamford Ridgeway Associates* v. *Board of Representatives*, 214 Conn. 407, 428, 572 A.2d 951 (1990) (same); *West Hartford Taxpayers Assn., Inc.* v. *Streeter*, 190 Conn. 736, 745, 462 A.2d 379 (1983) (same); *Donohue* v. *Zoning Board of Appeals*, 155 Conn. 550, 556, 235 A.2d 643 (1967) (same).

We conclude that the plaintiff's reliance on *Muller* is misplaced. Unlike the situation in *Muller*, in which it was unclear whether the word "any" meant "in any one" or "all or every"; *Muller* v. *Town Plan & Zoning Commission*, supra, 145 Conn. 328;[14] there simply is no ambiguity in the word "any" as used in § 16-245e (h) (4) (C). Rather, it is clear that within the context of

---

[14] In *Muller*, we considered whether the phrase, "lots within five hundred feet in *any* direction of the property included in the proposed change," referred to property located in a single direction from the property included in the proposed zone change or to property in every direction from that property. (Emphasis added.) *Muller* v. *Town Plan & Zoning Commission*, supra, 145 Conn. 328; see also *Stamford Ridgeway Associates* v. *Board of Representatives*, supra, 214 Conn. 407 (considering whether phrase "any proposed amendment" meant "a single proposed amendment" or "every proposed amendment"); *Donohue* v. *Zoning Board of Appeals*, supra, 155 Conn. 550 (considering whether phrase "any street bounding the block" meant "every street" or "one street, no matter which one"); compare *West Hartford Taxpayers Assn., Inc.* v. *Streeter*, supra, 190 Conn. 736 (construing phrase "any ordinance" and concluding that word "ordinance" did not include "budget provision") with *Dowling* v. *Slotnik*, 244 Conn. 781, 712 A.2d 396 (1998) (construing phrase "any person" and concluding that it included "all workers"), cert. denied sub nom. *Slotnik* v. *Considine*, 525 U.S. 1017, 119 S. Ct. 542, 142 L. Ed. 2d 451 (1998).

the phrase, "the department shall . . . (C) reduce such amount by the net proceeds that are above book value received by an electric company for the sale or lease of any real property"; General Statutes § 16-245e (h) (4); the word "any" does not mean "a single" or "some," but means "every." The focus of our inquiry, therefore, is not on the meaning of the word "any," but on the scope and contours of the phrase "any real property." In other words, we must determine whether, in light of the general rate-making principle referred to by the plaintiff, the phrase means "every real property" or "every utility real property."

Although the plaintiff claims that "any real property" is limited to utility real property, it cites no legislative history or other authority in support of its claim. It argues only that "[r]eading the word 'utility' into clause (C) . . . is *consistent* with [the act's] purpose, which is to offset stranded costs from regulated nuclear plants— there cannot be any nonutility stranded costs under the act." (Emphasis added.) Our task, however, is not to determine whether the legislature rationally *could have* inserted the word "utility" into the statute, but whether it actually intended to limit the application of the statute in such a way. In light of the statute's plain broad language and the express legislative policy to "mitigate [stranded] costs to the fullest extent possible" and to "[take] all reasonable steps to mitigate to the maximum extent possible the total amount of stranded costs that [the utility] seeks to claim and to minimize the cost to be recovered from customers"; General Statutes § 16-245e (c) (1); we conclude that the legislature had no such intent. If the legislature had intended to limit the application of the statute to utility property, it easily could have done so. "We are not permitted to supply statutory language that the legislature may have chosen to omit." *Vaillancourt* v. *New Britain Machine/Litton*, 224 Conn. 382, 396, 618 A.2d 1340 (1993). Accordingly,

we conclude that the phrase "any real property" in § 16-245e (h) (4) (C) refers to all real properties, not just to utility properties and, therefore, that the statute abrogates the rate-making principle articulated in *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control,* supra, 219 Conn. 69–70.

B

We next address the plaintiff's claim that the trial court improperly refused to consider its claim that the department's application of § 16-245e (h) (4) (C) violates the takings clause of the fifth amendment. We disagree.

We repeatedly have stated that "[w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned." (Citations omitted; internal quotation marks omitted.) *Merchant* v. *State Ethics Commission,* 53 Conn. App. 808, 818, 733 A.2d 287 (1999). These same principles apply to claims raised in the trial court.

In the present case, the plaintiff's entire constitutional argument in its brief to the trial court consisted of a single conclusory statement that the department's interpretation would result in an unconstitutional appropriation of its shareholders' property and a footnote providing the text of the fifth amendment and two citations to the effect that the takings clause applies both to tangible and intangible property and to de minimis appropriations. The plaintiff provided no authority or analysis in support of its specific claim that requiring it to apply the proceeds from the sale of nonutility

land to reduce its stranded costs constituted a taking. Accordingly, we conclude that the trial court properly declined to consider the plaintiff's constitutional claim.[15]

## II

### CLAIMS PERTAINING TO DISALLOWANCE OF CLAIMED COSTS OF SALE

The plaintiff also claims that the trial court improperly affirmed the department's disallowance under § 16-244f (a) (2) of: (1) costs incurred by the plaintiff in connection with its attempts to sell the properties in 1987 and 1994; and (2) the plaintiff's internal labor costs. We disagree.

### A

We first consider whether the court improperly affirmed the disallowance of costs incurred in connection with the plaintiff's previous attempts to sell the property under § 16-244f (a) (2), which defines "net

---

[15] We note that the plaintiff does not claim that its constitutional argument meets the standard for reviewability of unpreserved constitutional claims set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); see *Shawmut Mortgage Co.* v. *Wheat*, 245 Conn. 744, 755 n.9, 717 A.2d 664 (1998) (applying *Golding* analysis in civil case). Even if the plaintiff had made such a claim, however, we do not believe that the record is adequate for review. The gist of the plaintiff's constitutional argument is that the application of § 16-245e (h) (4) (C) to nonutility property is inconsistent with the rest of the act. The United States Supreme Court has held that "[i]nconsistencies in one aspect of the [ratemaking] methodology have no constitutional effect on the utility's property if they are compensated by countervailing factors in some other aspect." *Duquesne Light Co.* v. *Barasch,* 488 U.S. 299, 314, 109 S. Ct. 609, 102 L. Ed. 2d 646 (1989). To determine whether the overall effect of the rate order under review in *Duquesne Light Co.* was constitutional, the court looked at highly specific evidence of the economic effect of various aspects of the order on the utility. Id., 310–11. There is no such specific evidence pertaining to the economic effect of the various aspects of the act in the record before us in the present case. Instead, the plaintiff asks us simply to assume that it is somehow absolutely entitled to recover stranded costs from customers *and* that it is absolutely entitled to the proceeds from the sale of nonutility property.

proceeds" as "book income from the sale . . . of assets, consisting of sales price less reasonable expenses of sale . . . ." The plaintiff claims that the court improperly determined both that: (1) the department properly had concluded that, as a matter of statutory interpretation, the word "sale" is limited to the current sale and does not include previous attempts to sell the asset; and (2) the department's determination that the disallowed costs were not incurred in connection with the current sale was supported by substantial evidence.[16]

We first address whether the word "sale" as used in § 16-244f (a) (2) was intended to include previous unsuccessful attempts to sell the property that are completely unrelated to the actual sale. Because this question has not been subjected to judicial scrutiny, our review is plenary. See *Hatt* v. *Burlington Coat Factory*, 263 Conn. 279, 289, 819 A.2d 260 (2003); *Schiano* v. *Bliss Exterminating Co.*, supra, 260 Conn. 33–34. The plaintiff argues that previous attempts are included in the word "sale" because a contrary conclusion would frustrate the purposes of the act by penalizing unsuccessful efforts to reduce stranded costs by selling property. It also argues that it is unfair in the present case to allocate more than one half of the costs of sale to the utility and its shareholders while applying 100 percent of the proceeds to reduce stranded costs. The

---

[16] The only reason given by the department for the disallowance of the costs was that they were not "necessary for the current sale." The trial court stated in its memorandum of decision that the plaintiff's claim that that ruling was improper "is, ultimately, a disagreement over the department's factual determination that the costs incurred by [the plaintiff] in its negotiations with [Strand] in 1987 and 1994 were unrelated to the 2001 sale." The court appears to have *assumed* that, under the statute, the costs had to be incurred in connection with the current sale. Accordingly, it did not address the question of statutory interpretation. A fair reading of the parties' briefs to the trial court reveals, however, that the question of statutory interpretation was raised therein and, therefore, was preserved for review by this court.

department argues that the language of the statute indicates that "sale" means "materialized sale" because, otherwise, utilities would have no incentive to minimize costs and to pursue aggressively the closure of a sale. Although there is some merit to both of these public policy arguments, we conclude that the language of the statute and related statutes supports the department's interpretation.

Section 16-244f (a) (2) defines "net proceeds" as "the book income from the *sale* or divestiture of assets, consisting of sales price less reasonable expenses of *sale*, related income and other taxes." (Emphasis added.) It is a "familiar principle of statutory construction that where the same words are used in a statute two or more times they will ordinarily be given the same meaning in each instance." (Internal quotation marks omitted.) *Weinberg* v. *ARA Vending Co.*, 223 Conn. 336, 343, 612 A.2d 1203 (1992). Because the first use of the word "sale" in § 16-244f (a) (2) clearly refers to the actual sale, and not to previous unsuccessful sale attempts, the second use of "sale" is presumed to have the same meaning.

Moreover, General Statutes § 16-245e (c) (2) provides that "[t]he department shall allow the cost of such mitigation efforts to be included in the calculation of stranded costs to the extent that such mitigation costs are reasonable relative to the amount of the reduction in stranded costs resulting from the mitigation." "Because the legislature is always presumed to have created a harmonious and consistent body of law, the proper construction of any statute must take into account the mandates of related statutes governing the same general subject matter." (Internal quotation marks omitted.) *Common Fund* v. *Fairfield*, 228 Conn. 375, 381, 636 A.2d 795 (1994). As we have just noted, the same word used in a statute two or more times will be given the same meaning. Accordingly, because in the phrase,

"resulting from the mitigation," "mitigation" clearly refers to the actual mitigation—in the present case, the actual sale of the properties—the word is presumed to have the same meaning in the phrase "mitigation costs," i.e., the costs incurred in connection with the actual sale.

Finally, utilities are required to "mitigate [stranded] costs to the fullest extent possible" and to "[take] all reasonable steps to mitigate to the maximum extent possible the total amount of stranded costs that [the utility] seeks to claim and to minimize the cost to be recovered from customers." General Statutes § 16-245e (c) (1). This statutory provision indicates a legislative policy of maximizing the "net proceeds" to be applied to stranded costs and, therefore, supports the view that the legislature did not intend to allow utilities to recover expenses that have not contributed to the actual generation of proceeds. Accordingly, we conclude that only reasonable expenses that have been incurred in connection with the transaction that resulted in the actual sale may be deducted from the sales price under § 16-244f (a) (2).

We next consider whether the court properly concluded that the department's determination that the expenses incurred by the plaintiff in connection with its attempts to sell the property in 1987 and 1994 were not related to the actual sale was supported by substantial evidence. "The substantial evidence rule governs judicial review of administrative fact-finding under [the] UAPA. General Statutes § 4-183 (j) (5) and (6). Substantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . This substantial evidence standard is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review." (Internal quotation marks omitted.) *MacDermid, Inc.* v. *Dept. of Environ-*

*mental Protection*, 257 Conn. 128, 136–37, 778 A.2d 7 (2001). "The reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . ." (Internal quotation marks omitted.) *Tarullo* v. *Inland Wetlands & Watercourses Commission*, 263 Conn. 572, 584, 821 A.2d 734 (2003). "The burden is on the [plaintiff] to demonstrate that the [department's] factual conclusions were not supported by the weight of substantial evidence on the whole record." (Internal quotation marks omitted.) *MacDermid, Inc.* v. *Dept. of Environmental Protection*, supra, 137.

The court cited the following evidence in support of its determination that the department's ruling was supported by substantial evidence: Sal Giuliano, the manager of real estate and planning for the plaintiff, testified before the department that Strand "pulled their application" to buy the properties in the mid-1980s as a result of a collapse in the real estate market and opposition to the sale from the yacht club. During the 1990s, a number of other parties proposed projects for the properties, which the plaintiff considered. After the city prepared its revitalization plan for the area in which the properties were located, interest in the property increased. On the basis of that increased interest, in 1999, the plaintiff issued a request for proposals to a number of brownfield developers. The plaintiff chose Strand from among those who submitted proposals.

We conclude that the trial court properly determined that this testimony constituted substantial evidence supporting the department's finding that the expenses incurred by the plaintiff in 1987 and 1994 in connection with the negotiations with Strand were not related to the actual sale. The question before us is not whether

this evidence *compelled* the conclusion reached by the department or whether a different fact finder reasonably could have reached a different conclusion. Rather, the question is whether the evidence provides any substantial basis of fact from which the fact in issue reasonably could have been inferred. On the basis of Giuliano's testimony, the department reasonably could have inferred that the actual sale was the direct result of the request for proposals and the increased desirability of the properties in light of the city's revitalization efforts, and not a result of the unsuccessful sale efforts in 1987 and 1994.

The plaintiff argues, however, that "there is no evidence establishing whether [the plaintiff] was actually obligated to consummate a transaction with the highest bidder [in response to the request for proposals] or if, instead, the [request for proposals] was to test the reasonableness of the agreements with Strand, whether the 1994 agreement was terminated prior to the issuance of the [request for proposals] or whether the issuance of the [request for proposals] was an event of termination or default under the 1994 agreement. Absent [such] supporting evidence, [the department's] factual conclusion must be rejected." We agree that if the parties had presented evidence that the plaintiff expressly had terminated the 1994 agreement by issuing the request for proposals and was contractually obligated to accept the highest bid, such evidence could have bolstered the department's finding. That does not mean, however, that the evidence actually presented did not provide any basis of fact for the inferences made by the department. We conclude that it did.

## B

The plaintiff also claims that the trial court improperly determined that there was substantial evidence to

support the department's disallowance of $88,415 in internal labor costs as costs of sale. We disagree.

The department stated in its ruling that "the [plaintiff] currently recovers operating expenses, including the costs of its legal and real estate departments, in rates. Therefore, the department does not allow internal costs, past or present to be deducted [from] the sales proceeds." In its brief to the trial court, the plaintiff argued that "internal labor costs were not expensed or included in [the plaintiff's] rates, but were deferred to a balance sheet account which accumulated all costs associated with the transaction. Those costs were recorded in Account 108 (Retirement Work in Progress) while the transaction was pending and, upon closing of the transaction, will be transferred from Account 108 and applied against the gain on the sale." The trial court noted, however, that the plaintiff previously had provided the following response to an interrogatory by the department:[17] "Account 108 is included in the [plaintiff's] rate base and therefore any transaction costs that are booked to account 108 have an impact on the [plaintiff's] rate base. In the case of the Stamford land sale, however, the transaction costs were significantly offset (reduced) by a deposit of $550,000[18] that was received in 1987 and recorded as a credit to account 108. In fact, the net impact on account 108 as a result of the Stamford land sale was a credit until 1993 when the cumulative transaction costs first exceeded the deposit of $550,000. This time frame is important because it indicates that customers' rates in the late 1980s and through [mid-1996] reflected a credit in rate base. It wasn't until September, 1998, when [rates were established] that

---

[17] The department asked: "Please provide all journal entries for Transaction Costs. If transaction costs were included in Rate Base, please provide the interest component supported by customers."

[18] We assume that this was the deposit made by Strand in 1987 when it entered the purchase and sale contract. See footnote 9 of this opinion.

were based on data that reflected a net debit balance in account 108 of approximately $108,000 as a result of the Stamford land sale. Over the past twelve years or so, customers' rates reflected a credit in rate base for roughly ten years and a debit in rate base for roughly two years. The net cumulative impact would be a benefit to customers, albeit immaterial." Moreover, the court noted that Giuliano had testified that "[t]hese internal costs are costs incurred by company employees. . . . These are . . . employees that were and are within the real estate group, for instance, and as they are working on this specific transaction, they allocate their time accordingly to work orders which accumulate expenses for this particular transaction." The court concluded that this record constituted substantial evidence in support of the department's disallowance of internal labor costs.

In its brief to this court, the plaintiff states that the "[t]he trial court misunderstood the record" and argues for the first time that although amounts recorded in account 108 were included in its rate base and, therefore, affected customer rates, the amount recovered by the plaintiff through customer rates reflected only the *interest* on the amounts recorded in account 108, and the plaintiff has never recovered the amount of the actual expenses. We note, however, that in the proceedings before the department, the department specifically had asked the plaintiff to "provide the interest component supported by customers"; see footnote 17 of this opinion; and that the plaintiff had provided only the general response, previously quoted, that the internal labor costs "booked to account 108 have an impact on the [plaintiff's] rate base . . . ."

We find this factual record to be confusing, at best. Most significantly, it appears that the plaintiff applied the $550,000 deposit received from Strand, which, presumably, was part of the sale price for the property, to

its internal labor costs until those costs exceeded the deposit in 1998. We find it difficult to reconcile this fact with the department's determinations that (1) costs incurred in connection with unsuccessful sales attempts are not allowable and (2) internal labor costs are not allowable.

In any event, it is clear that the plaintiff represented to the department that "[a]ccount 108 is included in the [plaintiff's] rate base and therefore any transaction costs that are booked to account 108 have an impact on the [plaintiff's] rate base." The plaintiff did not provide any details as to what that "impact" was, beyond suggesting that it may have been somehow mitigated or masked by the deposit of $550,000 that was credited to the account, nor did it respond specifically to the department's request that it identify the interest component that was supported by its customers. Thus, even if it is assumed that the evidence supporting the department's determination that the plaintiff recovered its internal labor costs in rates was not particularly compelling, the plaintiff provided the department with no specific evidence to support its claim that the costs were *not* recovered in rates. Although this court has not addressed the issue, it is logical to conclude that the legislature intended that the burden of establishing "reasonable expenses of sale" under § 16-244f (a) (2) would be on the party claiming the expenses. Accordingly, we conclude that the trial court properly determined that there was substantial evidence to support the department's disallowance of the plaintiff's internal labor costs.

## III

Finally, we address the plaintiff's claim that the trial court improperly determined that the cumulative effect of the department's rulings was not so unfair, unjust

and unreasonable as to be arbitrary or capricious within the meaning of § 4-183 (j) (6). We disagree.

The plaintiff argues that it was manifestly unjust for the department to interpret § 16-244f (a) (2) to require its shareholders to bear more than one half of the cost of sale of the nonutility land while interpreting § 16-245e (h) (4) (C) to require the application of 100 percent of the proceeds to stranded costs. We have concluded, however, that the department and the trial court properly interpreted both § 16-244f (a) (2) and § 16-245e (h) (4) (C). We have no authority to order the department to ignore one or the other of these statutory mandates merely because their combined effect may be perceived as burdensome or unfair. Accordingly, we reject this claim.

The judgment is affirmed.

In this opinion the other justices concurred.