## MARIA TORRES ET AL. *v.* DEPARTMENT OF CORRECTION

Superior Court, Judicial District of Hartford
File No. CV-01-0819015S

---

Memorandum filed February 22, 2006

*Gersten, Clifford & Rome, LLP,* for the plaintiffs.

*Lynn D. Wittenbrink,* assistant attorney general, for the defendant.

HON. SAMUEL FREED, JUDGE TRIAL REFEREE. The present case arises from the tragic and horrific murder of a one year old child that occurred in the state of Florida in 1990. The facts[1] related to the child's

[1] The named plaintiff, Maria Torres, (plaintiff) attempts to present many facts through exhibits that are not considered in this memorandum of decision. "[B]efore a document may be considered by the court in support of a motion for summary judgment, there must be a preliminary showing of [the document's] genuineness, i.e., that the proffered item of evidence is what its proponent claims it to be. The requirement of authentication applies to all types of evidence, including writings . . . . Documents in support of or in opposition to a motion for summary judgment may be authenticated in a variety of ways, including, but not limited to, a certified copy of a document or the addition of an affidavit by a person with personal knowledge that the offered evidence is a true and accurate representation of what its proponent claims it to be." (Citation omitted; internal quotation marks omitted.) *New Haven* v. *Pantani,* 89 Conn. App. 675, 679, 874 A.2d 849 (2005). In the present case, the plaintiff submits several exhibits in support of her motion for summary judgment. The plaintiff fails, however, either to attach affidavits attesting to the truth and accuracy of the exhibits or to provide certified copies of any documents.

The defendant did not submit exhibits in support of its motion but did include documents to be considered in opposition to the plaintiff's motion for summary judgment. In these exhibits, only the defendant's partial transcripts of the hearing before the claims commissioner include certifications. Many of the facts that the plaintiff relies on are contained therein. In sum, the court takes the facts to be those that the plaintiff alleges in her complaint, any to which the defendant admits in its pleadings and any undisputed facts from the transcripts of the claims commissioner's hearing.

death are largely undisputed. On March 31, 1987, Alcides Quiles was arrested in Connecticut and, in May, 1988, was convicted on criminal charges, including more than one count of sexual assault, a count of robbery and more than one count of assault. One incident of sexual assault allegedly involved a minor. While Quiles was awaiting sentencing, he received four disciplinary reports, one for assault, two for fighting and one for self-mutilation. Quiles was convicted on the disciplinary report for armed assault on another inmate. On May 5, 1988, Quiles was sentenced to eighteen years of imprisonment for his crimes, to be suspended after twelve years. Initially, the department of correction, the defendant, committed Quiles to a maximum security prison, Somers correctional institution (Somers), based on Quiles' risk classification.[2]

On May 31, 1990, the defendant reduced Quiles' risk classification. Quiles was then moved to the Carl Robinson Correctional Institution (Carl Robinson), a facility with a lower degree of security,[3] on June 7, 1990. During the evening of August 31, 1990, Quiles allegedly gave away his personal belongings to other inmates in the presence of guards and undisputedly escaped from the prison by scaling its fence. Approximately two months

---

[2] Inmate risk classification is based on a one to five scale, with a five indicating the highest risk. Ratings are adjusted at intervals during an inmate's incarceration. In the defendant's reply to the plaintiff's memorandum opposing the defendant's motion, the defendant admits that Quiles originally was classified as a five. While at Somers, Quiles did not receive any disciplinary reports and won an award for breaking up a fight. Most of Quiles' time at Somers was spent, however, in protective custody, away from the other inmates, due to the fear that Quiles would be harassed because of the nature of the crimes he committed. Based, at least in part, on 35 percent of time served and good behavior, Quiles' rating was reviewed and changed to a three just prior to his move to the Carl Robinson Correctional Institution.

[3] Carl Robinson has a fence, but there are no guard towers or dogs. The plaintiff and the defendant disagree as to whether Carl Robinson is a minimum or medium security prison.

later, on October 28, 1990, in Miami, Florida, Quiles abducted a one year old child, Yoanna Noda (decedent), whom he raped and murdered.[4]

The decedent's mother, the plaintiff, then sought the permission of the claims commissioner to sue the defendant. From approximately the fall of 1999 to the spring of 2001, the claims commissioner conducted a hearing, and testimony was heard from several witnesses.[5] Ultimately, the claims commissioner denied the plaintiff permission to sue. Nevertheless, pursuant to General Statutes § 4-159,[6] the legislature issued a resolution giving the plaintiff permission to sue the defendant. Substitute House Joint Resolution No. 154 (2002).

[4] Quiles is now serving three life sentences in Florida for these crimes.

[5] The defendant submitted the testimony of four witnesses. First, Quiles' fellow inmate, James Reviczky, testified that prior to Quiles' escape, Quiles gave away his belongings to other inmates in the presence of guards. Second, Joseph Rowan, the plaintiff's expert witness, testified about the alleged shortcomings of the defendant's policies relating to Quiles' changed risk classification, the risk classification system overall and the procedures regarding escaped inmates. To illustrate the failure of the classification system, Rowan testified as to the high number of escapes from the facility. Specifically, Rowan testified that there were fifty-four escapes in five years, twenty-eight escapes occurring from within the institution and twenty-six occurring while the inmates were on furlough. Additionally, Rowan testified that approximately twenty inmates escaped in the twenty months ending with Quiles' escape. During Rowan's testimony, he also commented on the appropriateness of the defendant's denial of Quiles' request for a furlough a few weeks before the escape. Third, Paul Demers, a correctional officer at Carl Robinson at the time of Quiles' escape, attested that the defendant's response to the escape was appropriate and procedurally correct. Finally, John Sieminski, an employee of the defendant with experience in classification, testified about the risk classification system in general and about Quiles' specific classification.

[6] General Statutes § 4-159 provides: "After hearing, the Claims Commissioner shall make his recommendations to the General Assembly for the payment or rejection of amounts exceeding seven thousand five hundred dollars. Within five days after the convening of each regular session and at such other times as the speaker of the House of Representatives and president pro tempore of the Senate may desire, the Claims Commissioner shall submit such recommendations to the General Assembly, together with a copy of his findings and of the hearing record of each claim so reported. The General Assembly may (1) accept or alter any such recommendation

On August 20, 2002, the plaintiff, individually and as administratrix of the decedent's estate, commenced an action for wrongful death against the defendant pursuant to General Statutes § 52-555. The plaintiff, in her first amended complaint, alleges that the defendant failed to exercise reasonable care by not maintaining custody, charge and control of Quiles, by failing to classify Quiles properly and by not apprehending Quiles after the escape. The plaintiff further alleges that the defendant's failure to exercise reasonable care caused the decedent's death and that the defendant knew or should have known that if Quiles escaped he might harm others, including children.

The defendant moved for summary judgment and filed a memorandum of law in support of its motion on November 15, 2004. As the grounds for its motion, the defendant claims that it owed no duty to the plaintiff or the decedent, that the injury to the decedent was not legally foreseeable, that no sufficient causal nexus exists in the present case and that the public duty doctrine precludes recovery in the present action. On December 17, 2004, the plaintiff filed a cross motion for summary judgment, asserting a lack of triable issues of fact, and a memorandum of law in support of its motion that included a memorandum of law in opposition to the defendant's motion.[7] The defendant replied to the plaintiff's memorandum of law in opposition to the defendant's motion for summary judgment on Janu-

or (2) reject any such recommendation and grant or deny the claimant permission to sue the state. The General Assembly may grant the claimant permission to sue the state under the provisions of this section when the General Assembly deems it just and equitable and believes the claim to present an issue of law or fact under which the state, were it a private person, could be liable."

[7] The plaintiff also brought a motion for judgment on November 18, 2004. She argued that, because the state legislature gave her permission to sue, the only remaining issue to be decided was the amount of damages. The motion was denied by this court on August 24, 2005.

ary 11, 2005. In the same document, the defendant also filed a memorandum of law in opposition to the plaintiff's cross motion for summary judgment, arguing that there are genuine issues of material fact. Oral arguments on the motions were heard on October 28, 2005.

I

## ISSUES AND DISCUSSION

"The motion for summary judgment is designed to eliminate the delay and expense of litigating an issue when there is no real issue to be tried." (Internal quotation marks omitted.) *Navin* v. *Essex Savings Bank*, 82 Conn. App. 255, 258, 843 A.2d 679, cert. denied, 271 Conn. 902, 859 A.2d 563 (2004). "Practice Book [§ 17-49] provides that summary judgment shall be rendered . . . if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Internal quotation marks omitted.) *Hanks* v. *Powder Ridge Restaurant Corp.*, 276 Conn. 314, 321, 885 A.2d 734 (2005). "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law." (Internal quotation marks omitted.) *Cogan* v. *Chase Manhattan Auto Financial Corp.*, 276 Conn. 1, 6, 882 A.2d 597 (2005).

The issues regarding the present motions are whether the court should grant the motion for summary judgment in favor of the defendant on the grounds that (1) the suit against the defendant is precluded by the public duty doctrine; (2) the defendant did not owe a duty to maintain custody, charge or control or to apprehend an escaped inmate to unforeseeable plaintiffs, two citi-

zens of Miami, Florida, two months after the escape; or (3) the plaintiff cannot establish proximate cause in the present case because, even if the defendant was negligent, it was too remote temporally and geographically to the harm caused by the escapee. Alternatively, the court must determine whether the plaintiff's cross motion for summary judgment should be granted on the ground that there are no genuine issues of material fact as to the elements of negligence.[8]

## A

## The Public Duty Doctrine[9]

The first issue is whether a state entity, such as the defendant, may use the public duty doctrine as a

---

[8] Initially, it is noted that, during oral arguments, the plaintiff urged this court to adopt a strict liability standard, comparing Quiles to a wild animal. "[S]trict liability is available only where the Legislature has provided for it or in those situations where the common law of this state has imposed such liability and the Legislature has not seen fit to change it." (Internal quotation marks omitted.) *Appeal of Baldoumas Enterprises, Inc.*, 149 N.H. 736, 739, 829 A.2d 1056 (2003); see also *Gore* v. *People's Savings Bank*, 235 Conn. 360, 383, 665 A.2d 1341 (1995) (examining General Statutes § 47a-8 for legislative intent to create a strict liability standard). In the present case, the plaintiff does not allege and research does not reveal any statutory or common-law authority for applying strict liability in cases of escaped inmates. This court cannot, therefore, impose strict liability in the present case.

[9] At oral argument, the plaintiff urged that the defendant did not properly plead the public duty doctrine as an affirmative defense. In *Gauvin* v. *New Haven*, 187 Conn. 180, 184–85, 445 A.2d 1 (1982), the court held that governmental immunity ordinarily must be pleaded as a special defense, but it is unclear whether the public duty doctrine, as a separate defense, also must be pleaded. Regardless, the plaintiff's argument that the defendant did not properly plead the public duty doctrine was not asserted in her brief. This court "is not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . These same principles apply to claims raised in the trial court." (Citation omitted; internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 120, 830 A.2d 1121 (2003). Thus, this court declines to consider this argument as the plaintiff did not adequately brief it.

defense. No appellate case law discusses this issue. Connecticut courts have analyzed the public duty doctrine mostly in the context of municipalities.

"A municipality itself was generally immune from liability for its tortious acts at common law . . . but its employees faced the same personal tort liability as private individuals. It was once said that as a general rule governmental officers and employees were personally liable for their torts, more or less without exception, even where the governmental unit itself was protected by an immunity. This court first adopted a version of qualified official immunity in 1920 in *Wadsworth* v. *Middletown*, 94 Conn. 435, 439, 109 A. 246 (1920), where we said that since certain public officials were engaged upon a governmental duty . . . so long as they act in good faith, in the exercise of an honest judgment, and not in the abuse of their discretion, or maliciously or wantonly, they cannot be held liable. Thus, an exception to liability was carved out for discretionary acts, as long as they were not performed maliciously, wantonly or in an abuse of discretion." (Citations omitted; internal quotation marks omitted.) *Gordon* v. *Bridgeport Housing Authority*, 208 Conn. 161, 165–66, 544 A.2d 1185 (1988). Thereafter, in *Leger* v. *Kelley*, 142 Conn. 585, 589–90, 116 A.2d 429 (1955), the court adopted the public duty doctrine, which "provided even more immunity to public officials." *Gordon* v. *Bridgeport Housing Authority*, supra, 166. Subsequently, the public duty doctrine was reaffirmed in *Shore* v. *Stonington*, 187 Conn. 147, 152, 444 A.2d 1379 (1982), where the court said: "[I]f the duty which the official authority imposes upon an officer is a duty to the public, a failure to perform it, or an inadequate or erroneous performance, must be a [public, and] not an individual injury, and must be redressed, if at [all, in] some form of public prosecution. On the other hand, if the duty is a duty to

the individual, then a neglect to perform [it, or] to perform it properly, is an individual wrong, and may support an individual action for damages." (Internal quotation marks omitted.) Id.

Over the years, more than seventy Connecticut cases have addressed the public duty doctrine. Almost all of these cases involve municipalities and their officers and, therefore, the doctrine has developed almost exclusively in this context. See, e.g., *Williams* v. *New Haven,* 243 Conn. 763, 707 A.2d 1251 (1998) (suit against city); *Redfearn* v. *Ennis,* 28 Conn. App. 398, 610 A.2d 1338 (1992) (suit against city); *Trezzino* v. *Danbury,* Superior Court, judicial district of Danbury, Docket No. CV-03-0349938S (August 31, 2004) (*Richards, J.*) (suit against town); *Vilton* v. *Burns,* Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket Nos. X06-CV-00-0169481S, X06-CV-00-0169482S, X06-CV-00-0169483S (June 22, 2004) (37 Conn. L. Rptr. 425) (*Alander, J.*) (suit against city and two of its police officers). In the municipal context, the analysis of governmental immunity has come to encompass and to abrogate the public duty doctrine. See *Gordon* v. *Bridgeport Housing Authority,* supra, 208 Conn. 170 ("although the public duty doctrine provides the starting point of the analysis, distinctions between discretionary acts and ministerial acts are often controlling without regard to whether the duty is ascertained to be public or private"); *Violano* v. *Fernandez,* 88 Conn. App. 1, 11 n.10, 868 A.2d 69, cert. granted, 273 Conn. 936, 875 A.2d 544 (2005) ("[court] need not engage in a private versus public analysis, as the determination of the discretionary versus ministerial issue is dispositive"); see also *Fleming* v. *Bridgeport,* 92 Conn. App. 400, 406, 886 A.2d 1220 (2005).

Other jurisdictions, however, have articulated that the public duty doctrine and governmental immunity, along with sovereign immunity, are separate concepts.

"At common law, the doctrines of municipal and sovereign immunity co-existed with the public duty rule. . . . Municipal immunity first received judicial recognition in 1788. . . . Sovereign immunity was recognized as early as 1483. . . . Recognition of the public duty rule dates back to 1765. . . . The common law origins of the respective legal doctrines confirm that the public duty rule defense exists independent of the doctrines of municipal and sovereign immunity." (Citations omitted.) *Natrona County* v. *Blake*, 81 P.3d 948, 960 (Wyo. 2003) (Golden, J., dissenting).

The public duty rule has a legal rationale different from municipal and sovereign immunity. The public duty rule is grounded in tort law, not immunity. As the Supreme Court of Illinois explains: "Under the inapplicable concept of sovereign immunity, despite any apparent duty, the governmental entity is immune from tort liability. This does not occur from a denial of the tort's existence, but rather because the existing liability in tort is disallowed. In contrast, [under the rationale of the public duty rule] the tort liability or duty never existed." (Internal quotation marks omitted.) *Zimmerman* v. *Village of Skokie*, 183 Ill. 2d 30, 46, 697 N.E.2d 699 (1998). In a similar vein, the Supreme Court of South Carolina explains the difference between the public duty rule and immunity as follows: "The public duty rule is distinguishable from a defense of immunity, which is an affirmative defense that must be pleaded and can be waived. A defendant who pleads immunity conditionally admits the plaintiff's case, but asserts immunity as a bar to liability. In contrast, the public duty rule is a defense that denies an element of the plaintiff's cause of action—the existence of a duty of care to the individual plaintiff." *Steinke* v. *South Carolina Dept. of Labor, Licensing & Regulation*, 336 S.C. 373, 389, 520 S.E.2d 142 (1999). "The foregoing cases illustrate the fundamental conceptual difference

between the public duty rule and the doctrines of municipal and sovereign immunity. The doctrines of municipal and sovereign immunity protect governmental entities from liability for breach of an otherwise enforceable duty, while the public duty rule determines whether a duty in tort exists." *Natrona County* v. *Blake*, supra, 81 P.3d 960–61. Thus, the public duty doctrine exists as a distinct defense.

As a doctrine separate from governmental or sovereign immunity, the state and its subdivisions may assert the public duty doctrine, just as municipalities may maintain such a defense. See, e.g., *Ward* v. *Greene*, Superior Court, judicial district of New London, Complex Litigation Docket at Norwich, Docket No. X04-CV-99-0120118S (March 8, 2001) (*Koletsky, J.*). From its initial recognition, our Supreme Court held that the public duty doctrine barred suit against the commissioner of motor vehicles, an officer of a state entity. *Leger* v. *Kelley*, supra, 142 Conn. 589–91. The court did not distinguish between state or municipal entities and referred only to public officials. Id. Over time, courts also applied the public duty doctrine to municipalities. See, e.g., *Roman* v. *Stamford*, 16 Conn. App. 213, 219–22, 547 A.2d 97 (1988), aff'd, 211 Conn. 396, 559 A.2d 710 (1989). Additionally, the public duty doctrine has provided a defense for the department of public health, the state and state police troopers. *Ward* v. *Greene*, supra, Superior Court, Docket No. X04-CV-99-0120118S; *Nealy* v. *State*, Superior Court, judicial district of Waterbury, Docket No. CV-95-0128374 (September 18, 1997) (*Vertefeuille, J.*); but see *Short* v. *State*, Superior Court, judicial district of New Haven, Docket No. 298291 (May 13, 1991) (4 Conn. L. Rptr. 77, 78) (*Schimelman, J.*) ("the 'official responsibility rule' as articulated in *Shore* is applicable only where a plaintiff sues an individual in his capacity as an officer of the state . . . or where a plaintiff sues an individual in his capacity as an officer

or employee of a municipality" [citation omitted]). Furthermore, in other jurisdictions recognizing the public duty doctrine, the doctrine applies to the state and the state's subdivisions. See, e.g., *Kolbe v. State*, 625 N.W.2d 721, 729–30 (Iowa 2001); *Roe ex rel. Roe v. Dept. of Social & Rehabilitation Services*, 278 Kan. 584, 593–95, 102 P.3d 396 (2004); *Green v. Dept. of Transportation*, 151 S.W.3d 877, 881–85 (Mo. App. 2004); *Markowitz v. Dept. of Ins.*, 144 Ohio App. 3d 155, 161–63, 759 N.E.2d 838 (2001). In the present case, the defendant, the department of correction, is an entity of the state. The defendant, therefore, may assert the public duty doctrine as a defense.[10]

The next issue is whether the legislature waived its right to assert the public duty doctrine as a defense when it granted the plaintiff permission to sue under General Statutes § 4-160 (c). Section 4-160 (c) provides in pertinent part that in actions authorized pursuant to § 4-159 "[t]he state waives its immunity from liability and from suit in each such action *and waives all defenses which might arise from the . . . governmental nature of the activity complained of.* The rights and liability of the state in each such action shall be coextensive with and shall equal the rights and liability of private persons in like circumstances." (Emphasis

---

[10] Specifically, the court stated that "[i]t is true that [General Statutes] § 4-160 provides for the waiver of the state's sovereign immunity, thus making the state's rights and liability coextensive with and equal to those of a private person in like circumstances. . . . *The sole purpose* of § 4-160, however, is to remove the bar of sovereign immunity when the claims commissioner determines that it would be just and equitable to permit a claimant to seek redress against the state." (Citation omitted; emphasis added; internal quotation marks omitted.) *Chotkowski v. State*, 240 Conn. 246, 269–70, 690 A.2d 368 (1997). Unlike the present case, however, the issue in *Chotkowski* was not whether any other defenses may be waived under § 4-160 (c) but whether the statute, which allows a plaintiff to present a claim to the claims commissioner after the applicable limitation period has expired, was an "exclusive public emolument" prohibited under the state constitution. Id., 249.

added.) It is certain that sovereign immunity is waived under § 4-160. *Chotkowski* v. *State*, 240 Conn. 246, 269–70, 690 A.2d 368 (1997). The statute, however, does not enumerate other defenses that might be waived,[11] and the legislative history sheds no light on the subject. Additionally, although the language of the statute has existed since its inception in 1959, there is no appellate authority on point.

A judge of this court has held, however, that "the . . . decision to allow a suit to go forward only waives the state's claim of sovereign immunity *and other defenses that are governmental in nature.*" (Emphasis added.) *Wiersch* v. *State*, Superior Court, judicial district of New London, Docket No. 526866 (March 8, 1995) (13 Conn. L. Rptr. 598, 599) (*Hurley, J.*) (holding that state did not waive defense of recreational land use statute under § 4-160 [c]). The public duty doctrine is governmental in nature. Only governmental officers or entities, not private individuals or companies,[12] have

---

[11] At oral argument, the plaintiff argued that the legislature waived all defenses "except for the enumerated defenses that are contained therein." No enumerated defenses are contained in §§ 4-159 or 4-160 or in either statute's legislative history. Additionally, a search for the specific language argued by the plaintiff does not reveal any relevant cases or statutes supporting the plaintiff's argument. Furthermore, the plaintiff did not brief the issue. This court is "not required to review issues that have been improperly presented to this court through an inadequate brief." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 120, 830 A.2d 1121 (2003). The court, therefore, does not address this argument.

[12] At least one other jurisdiction has allowed the public duty doctrine to be asserted by private entities. See, e.g., *Tri-State Mint, Inc.* v. *Riedel Environmental Services*, 29 F.3d 424 (8th Cir. 1994) (private company that obtained and inspected hazardous waste samples solely on behalf of state protected by public duty doctrine); *Lawyer* v. *Kernodle*, 721 F.2d 632 (8th Cir. 1983) (private doctor who performed autopsy could assert public duty doctrine because information from autopsy would be used by prosecutor). Citing these cases, the defendant in the present case argues that the public duty doctrine should apply to the state because if it were a private entity the defense would be available. This argument is unpersuasive. "It is spurious logic to conclude that a doctrine that is, by definition, available only to *public* defendants can be consistent with a statute mandating that suits be

asserted the public duty doctrine as a defense in Connecticut. See, e.g., *Gordon* v. *Bridgeport Housing Authority*, supra, 208 Conn. 169; *Roman* v. *Stamford*, supra, 16 Conn. App. 213. Furthermore, the public duty doctrine only applies when a public duty, imposed by official authority, is in issue. See *Leger* v. *Kelley*, supra, 142 Conn. 589–90 ("if the duty which the official authority imposes upon an officer is a duty to the public, a failure to perform it, or an inadequate or erroneous performance, must be a public [and] not an individual injury").

In the present case, the defendant, an entity of the state, asserts the public duty doctrine as a defense. The legislature gave the plaintiff permission to sue the defendant pursuant to § 4-160 (c), but the statute waives governmental defenses. Because the public duty doctrine is a governmental defense, the defendant may not assert the public duty doctrine as a defense in the present case.

B

Duty

Because the public duty doctrine does not preclude suit in the present case, the next issue is whether the defendant owed the plaintiff and her decedent a duty to exercise reasonable care to take custody, charge and control of Quiles properly.[13] "The elements of a cause

determined in accordance with rules of law applicable to *private* parties. . . . Given the unambiguous directive of [the state's tort claims act], there is no legal or logical basis to conclude that the public-duty rule, which is by definition unavailable to private litigants, can apply to suits against the state . . . ." (Emphasis in original; internal quotation marks omitted.) *Ficek* v. *Morken*, 685 N.W.2d 98, 107 (N.D. 2004). Similarly, in the present case, the public duty doctrine cannot be sustained as a valid defense for the state because of the clear statutory waiver of governmental defenses and because the public duty doctrine is a governmental defense.

[13] The plaintiff also alleges that the defendant failed to exercise reasonable care to apprehend Quiles. The defendant did not brief whether a duty to apprehend exists. At oral argument, the defendant asserted that any duty to apprehend the escapee belongs to law enforcement and not to the depart-

of action . . . for a wrongful death are clear from the explicit language of the statute [§ 52-555], which as a statute in derogation of the common law is limited to matters clearly within its scope. . . . The plaintiff must prove not only a violation of a standard of care as a wrongful act, but also a causal relationship between the injury and the resulting death. A causal relation between the defendant's wrongful conduct and the plaintiff's injuries is a fundamental element without which a plaintiff has no case." (Internal quotation marks omitted.) *Ward* v. *Greene*, 267 Conn. 539, 546, 839 A.2d 1259 (2004).

In the present case, the plaintiff alleges the following facts in support of her wrongful death cause of action: (1) the defendant had custody of Quiles as an inmate; (2) the defendant had a duty to exercise reasonable care to take custody, charge and control of Quiles properly; (3) the defendant failed to exercise reasonable care by changing Quiles' risk classification and moving him to a lower security prison; (4) Quiles subsequently escaped and killed the decedent; and (5) the defendant's actions caused the decedent's death.

These allegations sound in negligence. "The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury. . . . Duty is a legal conclusion about relationships between individuals, made after the fact, and [is] imperative to a negligence cause of action. . . .

ment of correction. It seems plausible that the duty to apprehend an escapee would belong to an agency other than the defendant, particularly after a certain amount of time passes and because of the proximity of the prison to other states. Nevertheless, because the defendant failed to brief the issue, the court does not address whether a duty to apprehend exists. See *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 120, 830 A.2d 1121 (2003). Ultimately, the determination of whether the defendant owed a duty to apprehend has no bearing on the fact that several genuine issues of material fact exist in the present case, which must be submitted to a fact finder.

Thus, [t]here can be no actionable negligence . . . unless there exists a cognizable duty of care." (Internal quotation marks omitted.) *Murdock* v. *Croughwell*, 268 Conn. 559, 566, 848 A.2d 363 (2004). "Issues of negligence are ordinarily not susceptible of summary adjudication but should be resolved by trial in the ordinary manner." (Internal quotation marks omitted.) *Busque* v. *Oakwood Farms Sports Center, Inc.*, 80 Conn. App. 603, 607, 836 A.2d 463 (2003), cert. denied, 267 Conn. 919, 841 A.2d 1190 (2004). "[T]he issue of whether a defendant owes a duty of care is [however] an appropriate matter for summary judgment because the question is one of law." (Internal quotation marks omitted.) *Mozeleski* v. *Thomas*, 76 Conn. App. 287, 290, 818 A.2d 893, cert. denied, 264 Conn. 904, 823 A.2d 1221 (2003).

Our Supreme Court "has concluded that, [in the absence of] a *special relationship of custody or control,* there is no duty to protect a third person from the conduct of another." (Emphasis in original; internal quotation marks omitted.) *Murdock* v. *Croughwell,* supra, 268 Conn. 566. "[T]he relations between the actor and the other which require the actor to control the conduct of third persons for the protection of the other are stated in §§ 314A and 320 [of the Restatement (Second) of Torts]." (Internal quotation marks omitted.) Id., 570. The Restatement (Second) of Torts provides that "[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." 2 Restatement (Second), Torts § 319, p. 129 (1965).

Although our Supreme Court has not yet adopted § 319, it has stated that "in the proper factual circumstances, this court may want to consider whether to recognize the principles of § 319 insofar as they impose a special duty upon custodians to control the behavior

of their wards." *Kaminski* v. *Fairfield*, 216 Conn. 29, 35, 578 A.2d 1048 (1990). The proper factual circumstances exist here for the court to recognize the principles of § 319 because the defendant is a state institution that had formal, custodial responsibility for Quiles, as its ward. This gives rise to the existence of a special relationship. See, e.g., *Doe* v. *United Social & Mental Health Services*, 670 F. Sup. 1121, 1130–31 (D. Conn. 1987) (applying § 319 to suit by victim against halfway house for harm caused by felon); *Brown* v. *Washington County*, 163 Or. App. 362, 364, 987 P.2d 1254 (1999) (against county for harm caused by county corrections center escapee), review denied, 331 Or. 191, 18 P.3d 1098 (2000); *Natrona County* v. *Blake*, supra, 81 P.3d 957–58 (against county for harm caused by escaped inmate). Consequently, this court considers whether the defendant had a duty to protect third parties from the ward's violent acts.

"The test for determining legal duty is a two-pronged analysis that includes: (1) a determination of foreseeability; and (2) public policy analysis. . . . Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action. . . . The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised. . . . [In other words], would the ordinary [person] in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?" (Citation omitted; internal quotation marks omitted.) *Monk* v. *Temple George Associates, LLC*, 273 Conn. 108, 114–15, 869 A.2d 179 (2005).

The plaintiff argues that reasonable minds could not differ in concluding that the defendant knew or should have known of the danger that Quiles would pose if he

escaped. Specifically, the plaintiff asserts that reasonable minds could not differ about the fact that the defendant was negligent in changing Quiles' risk classification and that this negligent act led to Quiles' escape and the heinous crimes he committed. This court cannot say, as a matter of law, that it agrees with this conclusion. "[T]he extent to which a criminal act was reasonably foreseeable to a particular plaintiff in any given case is a question of facts and circumstances." Id., 121 n.11; see also *Smith* v. *Dept. of Corrections*, 432 So. 2d 1338, 1340 (Fla. App. 1983) (holding that prisoner's lengthy history of violence coupled with escape record created jury question on issue of foreseeability of victim's injury); *Maroon* v. *State*, 411 N.E.2d 404, 415 (Ind. App. 1980) (stating that foreseeability was question of fact for jury). Moreover, "[i]f there is conflicting evidence . . . the fact finder is free to determine which version of the event in question it finds most credible." (Internal quotation marks omitted.) *Fink* v. *Golenbock*, 238 Conn. 183, 210, 680 A.2d 1243 (1996). "It is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the . . . effect to be given the evidence." (Internal quotation marks omitted.) *Martin Printing, Inc.* v. *Sone*, 89 Conn. App. 336, 347–48, 873 A.2d 232 (2005).

In the present case, the plaintiff's alleged theory of negligence rests on finding that the defendant improperly changed Quiles' risk classification. Looking to the transcripts of the hearing by the claims commissioner, it is difficult for this court to determine even whether Quiles' classification rating was properly brought up for review. Specifically, for example, John Sieminski, the defendant's employee with experience in classification, confirms that "within two years [Quiles] had already met the 35 percent [of time served] requirement [to qualify for a change in risk classification]." Basing

this calculation on the date Quiles was arrested, March 31, 1987, to the date of the classification review, May 31, 1990, which is more than three years, time served is only approximately 26 percent. Sieminski goes on to testify that the defendant "utilized the override code six which means other, explaining reasons, which they did by stating he met the 35 percent criteria as well as explaining good institutional behavior." Therefore, the question remains as to whether other factors, such as "code six," account for the discrepancy in the time calculation or whether Quiles' risk classification was improperly calculated.

Additionally, as to whether the harm was foreseeable, on one hand, Quiles had never murdered anyone before, had never attempted to escape, had never been incarcerated before, had no history of violent behavior for approximately two and one-half years and had won an award for breaking up a prison fight. On the other hand, Quiles' initial offenses were of a violent nature. He had four disciplinary reports while awaiting sentencing, had requested but been denied a furlough and had allegedly given his personal belongings away to other inmates in the presence of guards just before his escape. These facts may or may not indicate whether the defendant was negligent in terms of changing Quiles' risk classification, which allegedly caused his escape and the harm suffered, or whether the defendant, at the time of the escape, knew or should have known of the danger that Quiles posed. Thus, questions of fact exist and the issue cannot be resolved on a motion for summary judgment.

In addition to the requirement that the harm be foreseeable, it must also be determined whether the plaintiff and her decedent were foreseeable victims. The plaintiff argues that a foreseeable victim is required only where there is harm to a third person caused by the patient of a psychotherapist according to *Fraser* v. *United*

*States*, 236 Conn. 625, 674 A.2d 811 (1996). The defendant argues that a foreseeable plaintiff is required in every case.

It is arguable whether a foreseeable plaintiff is required in every case of negligence in Connecticut.[14] What is definitely required is an inquiry into whether "the ordinary [person] in the defendant's position,

---

[14] Connecticut courts tend to follow the dissent of Judge Andrews in the case of *Palsgraf* v. *Long Island Railroad Co.*, 248 N.Y. 339, 162 N.E. 99 (1928), instead of Judge Cardozo's majority opinion. D. Wright, J. Fitzgerald & W. Ankerman, Connecticut Law of Torts (3d Ed. 1991) § 33, p. 59. As a result, foreseeability in Connecticut is generally *only* an inquiry into whether an act was negligent—without taking Judge Cardozo's second step of determining whether the plaintiff was foreseeable. See, e.g., *Monk* v. *Temple George Associates, LLC*, supra, 273 Conn. 115. Over time, a few appellate cases, however, have included language seemingly requiring a foreseeable plaintiff. In *RK Constructors, Inc.* v. *Fusco Corp.*, 231 Conn. 381, 385–86, 650 A.2d 153 (1994), our Supreme Court stated: "[T]he nature of the duty, *and the specific persons to whom it is owed*, are determined by the circumstances surrounding the conduct of the individual. . . . [I]nitially, if it is not foreseeable to a reasonable person in the defendant's position that harm of the type alleged would result from the defendant's actions *to a particular plaintiff*, the question of the existence of a duty to use due care is foreclosed, and no cause of action can be maintained by the plaintiff." (Citations omitted; emphasis added; internal quotation marks omitted.)

The court quoted portions of this language in *Fraser* v. *United States*, supra, 236 Conn. 633, and again in *Lodge* v. *Arett Sales Corp.*, 246 Conn. 563, 574, 717 A.2d 215 (1998). In *Fraser*, however, the court limited liability to foreseeable plaintiffs in furtherance of the public policy goal of protecting the therapeutic relationship between patient and psychotherapist, borrowing somewhat from the public duty doctrine. *Fraser* v. *United States*, supra, 634–36. In *Lodge*, the court stated that "[w]hat is relevant . . . is the . . . attenuation between [the defendant's] conduct, on the one hand, and the consequences to and the identity of the plaintiff, on the other hand." (Internal quotation marks omitted.) *Lodge* v. *Arett Sales Corp.*, supra, 574. Nevertheless, the court did not analyze whether a foreseeable plaintiff was required and restated the previous test as "nothing more than a determination of whether the harm was a reasonably foreseeable consequence of the defendants' conduct." Id., 574–75. Thus, it is difficult to say whether a foreseeable plaintiff is required in every negligence cause of action. See, e.g., *Monk* v. *Temple George Associates, LLC*, supra, 273 Conn. 108 (not analyzing foreseeable plaintiff); but see, e.g., *Silk* v. *Gill*, Superior Court, judicial district of Litchfield, Docket No. CV-05-4002254S (September 15, 2005) (40 Conn. L. Rptr. 14) (*Bozzuto, J.*) (analyzing foreseeable plaintiff).

knowing what he knew or should have known, [would] anticipate that harm of the general nature of that suffered was likely to result?" (Internal quotation marks omitted.) *Monk* v. *Temple George Associates, LLC*, supra, 273 Conn. 115. By comparison, other jurisdictions more clearly require both foreseeable harm and a foreseeable plaintiff. See, e.g., *Mellon Mortgage Co.* v. *Holder*, 5 S.W.3d 654, 655 (Tex. 1999) ("[a]ll that is required is [1] that the injury be of such a general character as might reasonably have been anticipated; and [2] that the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen" [internal quotation marks omitted]). Nevertheless, our Supreme Court has plainly contemplated a requirement of foreseeability in cases involving legal custodians. "Arguably, legally designated custodians may also have a common law duty to protect foreseeable third parties from their wards' aggressive behavior." *Kaminski* v. *Fairfield*, supra, 216 Conn. 35; see also *Gillum* v. *Yale University*, Superior Court, judicial district of New Haven, Docket No. CV-91-0314737 (June 28, 1996) (17 Conn. L. Rptr. 279) (*Licari, J.*). The defendant in the present case is undisputedly a legally designated custodian, and Quiles, its ward, caused harm. Thus, it is required that the plaintiff and her decedent, as third parties, be foreseeable victims.

Whether the plaintiff and her decedent were foreseeable victims is a question of fact. This issue must also be determined by the fact finder. See *Fraser* v. *United States*, supra, 236 Conn. 646 (*Berdon, J.*, dissenting); see also *Mikita* v. *Barre*, Superior Court, judicial district of New Haven, Docket No. CV-99-0430564 (May 22, 2001) (*Munro, J.*); *Castorina* v. *Stewart*, Superior Court, judicial district of Fairfield, Docket No. CV-95-0324487 (June 3, 1998) (22 Conn. L. Rptr. 1) (*Skolnick, J.*). In the defendant's memorandum of law in support

of its motion for summary judgment, the defendant argues that the plaintiff and her decedent were unforeseeable victims. In the transcripts of the hearing by the claims commissioner, proffered by the defendant, the plaintiff's expert witness testified, however, that Quiles attempted sexual assault on a six year old boy in 1987 and that Quiles received no sexual offender treatment. Reasonable minds could differ, therefore, about whether the decedent was in a foreseeable class of victims because of Quiles' prior sexual assault on a minor. In sum, the defendant had the burden to show that no genuine issues of material fact remains, and it has not sustained its burden. Because genuine issues of material fact exist as to whether the harm suffered was foreseeable and whether the plaintiff and her decedent were foreseeable victims, summary judgment is inappropriate on the issue of whether a duty exists in the present case.[15]

## C

### Proximate Cause

The last issue is whether the plaintiff cannot, as a matter of law, establish proximate causation. "To prevail on a negligence claim, a plaintiff must establish that the defendant's conduct legally caused the injuries. . . . [L]egal cause is a hybrid construct, the result of balancing philosophic, pragmatic and moral approaches to causation. The first component of legal cause is causation in fact." (Internal quotation marks omitted.) *Malloy* v. *Colchester*, 85 Conn. App. 627, 633, 858 A.2d 813, cert. denied, 272 Conn. 907, 863 A.2d 698 (2004).

---

[15] Because issues of foreseeability must be addressed by the fact finder, any findings by this court on public policy would be premature. The court sitting as fact finder may determine that the harm and, or, the victim were unforeseeable, which would render a decision on public policy moot. This court does not, therefore, address the parties' public policy arguments.

The second component of causation is "[p]roximate cause [which is] defined as an actual cause that is a substantial factor in the resulting harm . . . . The test for proximate cause is whether the defendant's conduct was a substantial factor in producing the plaintiff's injury. . . . This substantial factor test reflects the inquiry fundamental to all proximate cause questions, namely, whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negligence. . . . The question of proximate causation generally belongs to the trier of fact because causation is essentially a factual issue. . . . It becomes a conclusion of law only when the mind of a fair and reasonable [person] could reach only one conclusion; if there is room for a reasonable disagreement the question is one to be determined by the trier as a matter of fact." (Citations omitted; internal quotation marks omitted.) *Label Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 321–22, 852 A.2d 703 (2004).

"The fundamental inquiry of proximate cause is whether the harm that occurred was within the scope of foreseeable risk created by the defendant's negligent conduct. . . . *In negligence cases . . . in which a tortfeasor's conduct is not the direct cause of the harm, the question of legal causation is practically indistinguishable from an analysis of the extent of the tortfeasor's duty to the plaintiff.*" (Emphasis added; internal quotation marks omitted.) *Malloy* v. *Colchester*, supra, 85 Conn. App. 633–34. In the present case, the cause of action for wrongful death sounds in negligence, and the defendant's conduct is not the direct cause of the harm suffered. Thus, the question of foreseeability as it relates to proximate cause is virtually identical to the question of foreseeability under duty.

As noted previously, reasonable minds could differ about the facts presented. On one hand, according to transcripts of the proceeding in front of the claims

commissioner, Quiles had never murdered anyone before, had never attempted to escape, had no history of violent behavior for approximately two and one-half years and had won an award for breaking up a prison fight. On the other hand, Quiles' initial offenses were of a violent nature, he had four disciplinary reports while awaiting sentencing, had requested but been denied a furlough and had allegedly given his personal belongings away to other inmates in the presence of guards just before his escape. Additionally, while several inmates had escaped from Carl Robinson, little evidence suggests that the defendant should expect a murder to result. This evidence and its weight may be differently interpreted by the fact finder. See *Martin Printing, Inc.* v. *Sone*, supra, 89 Conn. App. 347–48. Because these facts could be subject to different interpretations, this court cannot hold, as a matter of law, that the resulting harm to the plaintiff and her decedent was within the scope of foreseeable risk created by the defendant's alleged negligence, nor can it hold that the alleged negligence was so inconsequential or trivial that it could not be found to be a substantial factor in the harm that resulted. Thus, for purposes of the defendant's motion for summary judgment, viewing the evidence in the light most favorable to the plaintiff, the question of whether the harm in the present case was within the foreseeable scope of risk created by the defendant's act or failure to act is a genuine issue of material fact that must be submitted to the fact finder.

The defendant's argument that, as a matter of law, its alleged negligence is too remote temporally or geographically to the harm is unavailing. "[A] defendant's misconduct is not too remote for liability merely because time or distance separates the defendant's act from the plaintiff's harm." 1 D. Dobbs, Torts § 180, p. 445 (2001). "Remoteness in time or space may give rise to the likelihood that other intervening causes have

taken over the responsibility. But when causation is found, and other factors are eliminated, it is not easy to discover any merit whatever in the contention that such physical remoteness should of itself bar recovery." W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 43, p. 283. Connecticut courts have never established bright line rules as to how far or how long might be too far or too long. See, e.g., *Komjathy* v. *146 Kings Highway LLC*, Superior Court, judicial district of Fairfield, Docket No. CV-02-0388947 (May 3, 2005) (*Doherty, J.*) (denying motion to strike on ground that period of two years between defendant's alleged negligence and harm too remote). This court also declines to do so in the present case.

The plaintiff's argument that there should be no constraints on liability as to time and geography is, however, equally unpersuasive. Specifically, she asserted at oral argument that the boundaries in cases of escaped inmates should be the entire world for all of time. "In determining proximate cause, the point beyond which the law declines to trace a series of events that exist along a chain signifying actual causation is a matter of fair judgment and a rough sense of justice." (Internal quotation marks omitted.) *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, 250 Conn. 14, 25, 734 A.2d 85 (1999), citing *Palsgraf* v. *Long Island Railroad Co.*, 248 N.Y. 339, 354–56, 162 N.E. 99 (1928) (Andrews, J., dissenting). "[I]t is the plaintiff who bears the burden to prove an unbroken sequence of events that tied his injuries to the [defendants' conduct]. . . . The existence of the proximate cause of an injury is determined by looking from the injury to the negligent act complained of for the necessary causal connection. . . . [The] causal connection must be based upon more than conjecture and surmise." (Citations omitted; internal quotation marks omitted.) *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, supra, 25–26. Therefore, at trial

here, the plaintiff must prove an unbroken chain of events between the defendant's alleged negligence and the harm to her and her decedent. The trial court must then determine whether the evidence establishes that the harm was within the foreseeable scope of the risk created by the defendant.

Finally, the court reiterates that it was the movant's burden to establish that no genuine issue of material fact exists. In the present case, the defendant did not submit *any* exhibits to substantiate its motion for summary judgment. Moreover, the plaintiff did not submit *any authenticated* exhibits to support her cross motion for summary judgment. As to the defendant's memorandum of law in opposition to the plaintiff's motion for summary judgment,[16] the defendant's only authenticated evidence was certified transcripts of the claims commissioner hearing that the defendant used to support its position that genuine issues of material fact existed. "Practice Book [§ 17-49] provides that summary judgment shall be rendered . . . if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Internal quotation marks omitted.) *Hanks* v. *Powder Ridge Restaurant Corp.*, supra, 276 Conn. 321. Notwithstanding the hearing transcripts, which undermine the defendant's motion for summary judgment because they illustrate many questions of fact, the court finds that neither party has sustained its burden of proof. Therefore, due to the lack of admissible evidence presented, it cannot be said as a matter of law that either party has established that there are no genuine questions of material fact remaining and that they are entitled to judgment as a matter of law.

---

[16] The transcripts are attached to the document containing both the defendant's reply brief and its memorandum of law in opposition to the plaintiff's motion for summary judgment but are almost exclusively cited in its opposition memorandum.

## II

## CONCLUSION

In conclusion, this court holds that there are genuine issues of material fact that must be decided by the fact finder.[17] First, although the public duty doctrine may be raised as a defense by a state entity, the defense was waived, along with sovereign immunity, under § 4-160 (c). Second, the parties have failed to establish the absence of a genuine issue of material fact as to whether a reasonable person, knowing what he knew or should have known, would anticipate that the inmate would escape, rape and kill a child because of the defendant's acts or failure to act. Additionally, a fact finder must decide whether the plaintiff and her decedent were foreseeable victims. Finally, a genuine issue of material fact exists as to proximate cause, and a fact finder must determine whether the defendant's conduct was a substantial factor in producing the harm in the present case. Thus, because several genuine issues of material fact exist that must be decided by the fact finder, the court denies both the defendant's motion for summary judgment and the plaintiff's cross motion for summary judgment.

---

[17] It should be noted that this case will not be submitted to a jury pursuant to General Statutes § 4-160 (f), which provides: "Issues arising in such actions shall be tried to the court without a jury."