JAMIE G., ADMINISTRATOR (ESTATE
OF TONI G.) *v.* DEPARTMENT OF
CHILDREN AND FAMILIES*
(SC 20997)

Mullins, C. J., and McDonald, Ecker, Alexander and Dannehy, Js.

*Syllabus*

Pursuant to statute (§ 4-160 (a)), "the Claims Commissioner . . . may autho-
rize suit against the state on any claim which . . . presents an issue of law
or fact under which the state, were it a private person, could be liable,"
and "[t]he state may file an opposition . . . based solely on jurisdictional
grounds . . . or . . . judicial, quasi-judicial or legislative immunity."

Pursuant further to statute (§ 4-160 (h)), "[i]n each action authorized by the
Claims Commissioner . . . the state waives its immunity from liability and
from suit . . . and waives all defenses which might arise from the eleemosy-
nary or governmental nature of the activity complained of, and . . . the
rights and liability of the state . . . shall be coextensive with and shall
equal the rights and liability of private persons in like circumstances."

The plaintiff sought to recover damages from the defendant, the Department
of Children and Families (DCF), for, inter alia, the death of T, the plaintiff's
four year old daughter, who wandered unattended and drowned in a pond.
Prior to the drowning incident, the Probate Court had removed the plaintiff
and T's biological mother as guardians and vested temporary custody of T
in T's maternal relatives, A and L. To assist it in determining whether to

⁶ There is no claim before us that the case should be remanded to the
trial court for a new hearing in damages because the trial court might have
awarded a lesser amount of punitive damages had it known that the plaintiff
was entitled to treble damages under § 52-571h (b). See, e.g., *State* v. *Saucier*,
283 Conn. 207, 223, 926 A.2d 633 (2007) ("[a]n unmentioned claim is, by
definition, inadequately briefed, and one that is generally . . . considered
abandoned" (internal quotation marks omitted)). Likewise, this opinion does
not address any other claims that could have been made by the defendants
but were not made because of their failure to appear.

* In accordance with our policy of protecting the privacy interests of the
victims of family violence, we decline to identify the victim or others through
whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Jamie G. *v.* Dept. of Children & Families

grant a full transfer of guardianship to A and L, the Probate Court commissioned DCF to conduct a study of the home of A and L and to generate a report of its findings. DCF submitted the report to the Probate Court, but, before that court could hold a hearing to determine whether to transfer guardianship, T died. The plaintiff, as the administrator of T's estate, thereafter sought and was granted permission by the claims commissioner to bring an action against the state. The plaintiff claimed, inter alia, that the negligence of DCF personnel in investigating T's living situation and in advising the Probate Court that A and L's home was a suitable placement for T was a proximate cause of T's death. Specifically, the plaintiff included allegations in his complaint of negligence that related both to DCF's recommendations to the Probate Court regarding T's best interest and to DCF's alleged failure to properly execute various independent duties to protect T from abuse and neglect. DCF filed a motion to dismiss, contending that the trial court lacked subject matter jurisdiction because DCF is entitled to absolute judicial or quasi-judicial immunity for its activities integral to the judicial process, such as conducting a court-ordered investigation and issuing court-ordered recommendations. The trial court granted the motion, concluding that DCF was entitled to absolute quasi-judicial immunity while functioning as an arm of the Probate Court, that the claims commissioner cannot waive such immunity, and that the plaintiff's allegations were insufficient to overcome DCF's immunity. The plaintiff appealed from the trial court's dismissal of his action, claiming, inter alia, that, when the claims commissioner allows a private party to bring an action against a state agency, such as DCF, the state waives not only its sovereign immunity, but other common-law immunities, such as quasi-judicial immunity. *Held*:

The trial court correctly concluded that the claims commissioner's waiver of sovereign immunity under § 4-160 does not bar the state from raising a jurisdictional claim of absolute quasi-judicial immunity, but this court reversed in part the trial court's judgment and remanded the case for further proceedings insofar as some of the plaintiff's allegations may have exceeded the scope of that immunity.

The plaintiff failed to satisfy his burden of establishing that the legislature clearly evinced an intent, through § 4-160, to abolish common-law judicial or quasi-judicial immunity for purposes of that statute, as the text of § 4-160 allows the state to assert any defenses and immunities available to a private defendant and expressly permits the state to preserve the right to assert a common-law immunity, such as quasi-judicial immunity, even though the claims commissioner has waived the state's sovereign immunity.

Moreover, the principle that courts are to narrowly interpret statutes in derogation of the common law militated against construing the waiver contemplated by § 4-160 to include not only sovereign immunity, but other common-law immunities, this court would not lightly assume that the legislature had chosen to infringe on the traditional immunities fashioned by the judiciary to safeguard the essential character and function of the judicial

Jamie G. *v.* Dept. of Children & Families

branch of government, and the legislative history of § 4-160 supported a construction of that statute that did not contemplate the waiver of quasi-judicial immunity.

This court concluded that the language in § 4-160 (h) (1) providing that the state "waives all defenses which might arise from the eleemosynary or governmental nature of the activity complained of" does not apply to the judicial or quasi-judicial immunity referenced in § 4-160 (a) and (d) (1), and, instead, the "all defenses" language was strictly construed to apply only to defenses such as governmental immunity, the public duty doctrine, and related eleemosynary defenses.

This court agreed with the plaintiff that, although certain acts that DCF personnel performed at the direction of the Probate Court were shielded by absolute quasi-judicial immunity as a matter of law, the trial court should not have dismissed the plaintiff's action in its entirety insofar as at least some of the allegedly negligent conduct at issue may not have been undertaken by DCF personnel as an arm of the Probate Court and may have involved the performance of legal duties independent of those carried out at the direction of that court.

With respect to most of the plaintiff's allegations, the nature of the claim was not sufficiently clear and the record was not sufficiently developed for this court to determine whether absolute quasi-judicial immunity applied, and, accordingly, the case was remanded so that, with respect to those particular allegations, the trial court could make those determinations in the first instance once an adequate record is established and could decide whether to hold additional hearings on DCF's motion to dismiss to enable the establishment of the necessary jurisdictional facts, or to defer those factual determinations until trial.

Argued January 30—officially released August 5, 2025

*Procedural History*

Action to recover damages for the wrongful death of the plaintiff's decedent as a result of the defendant's alleged negligence, and for other relief, brought to the Superior Court in the judicial district of Waterbury, where the court, *D'Andrea, J.*, granted the defendant's motion to dismiss and rendered judgment thereon, from which the plaintiff appealed. *Reversed in part*; *further proceedings*.

*Stephanie Z. Roberge*, for the appellant (plaintiff).

*Robert J. Deichert*, assistant attorney general, with whom were *Thadius L. Bochain*, assistant attorney gen-

Jamie G. *v.* Dept. of Children & Families

eral, and, on the brief, *William Tong*, attorney general, and *Carolyn Signorelli* and *Christopher Groleau*, assistant attorneys general, for the appellee (defendant).

*Opinion*

MULLINS, C. J. This case arises from a tragic accident in which four year old Toni G. drowned after the Probate Court had vested her temporary custody in her maternal relatives. To assist it in determining whether to grant a full transfer of guardianship to those relatives, the Probate Court commissioned the defendant, the Department of Children and Families (DCF), to conduct a study of their home and to produce a report of its findings. DCF did so and submitted the report to the Probate Court. Before that court could hold a hearing to determine whether to transfer guardianship, however, Toni died. Her estate sought permission to bring the present action, which alleges that the negligence of DCF social workers, in investigating Toni's living situation and advising the Probate Court that the maternal relatives' home was a suitable placement for Toni, was a proximate cause of her death. After a hearing, the claims commissioner waived the state's sovereign immunity and authorized the estate to sue the state.

The primary issue presented on appeal is whether the claims commissioner's authorization to sue the state under General Statutes § 4-160 (a) and (h)[1] not only waives the state's sovereign immunity, but also abrogates the common law to preclude the state from raising a claim of judicial or quasi-judicial immunity.[2] We agree with the trial court that a waiver of sovereign immunity under that statute does not bar the state from raising a

_____

[1] Section 4-160 was the subject of amendments in 2022, 2023 and 2024; see Public Acts 2024, No. 24-44, § 12; Public Acts 2023, No. 23-131, § 10; Public Acts 2022, No. 22-37, §§ 3 and 4; that have no bearing on the merits of this appeal. In the interest of simplicity, unless otherwise indicated, we refer to the current revision of the statute.

[2] The relevant statutory language is set forth in part II of this opinion.

Jamie G. *v.* Dept. of Children & Families

jurisdictional claim of absolute quasi-judicial immunity before that court. As we will explain, we are compelled to construe narrowly legislative waivers of sovereign immunity, and we will interpret a statute to have abrogated the common law only when the statutory language evidences a clear intent to do so. The latter principle applies with particular force to purported encroachments on common-law judicial and quasi-judicial immunities, the abrogation of which would raise serious separation of powers issues. Because we perceive in § 4-160 no clear and unequivocal legislative intent to abrogate DCF's quasi-judicial immunity, we reject the plaintiff's contention that the claims commissioner waived that immunity. Nevertheless, we remand the case for further proceedings because some of the allegations in the complaint appear to exceed the scope of that immunity.

I

The following relevant facts are alleged in the complaint or are uncontroverted.[3] Toni was born in April, 2008, to her father, the plaintiff, Jamie G., who brought the present action as administrator of her estate, and her mother, Ashley. Toni's brother, Dominic, was born in 2010.

Throughout Toni's short life, DCF had repeated involvements with the family. Only one allegation of neglect was substantiated, arising from a June, 2010 domestic violence incident between the plaintiff and Ashley. Nevertheless, DCF provided the children treatment and other services for a total of approximately ten months between 2008 and late 2010, when Ashley relocated the children to the home of her birth mother in Massachusetts. DCF made a referral to its Massachusetts counterpart and closed the case. DCF claims to

_____

[3] The plaintiff has not contested the factual accuracy of the study for removal of guardianship that DCF submitted in support of its motion to dismiss.

Jamie G. *v.* Dept. of Children & Families

have received no new allegations of neglect after October, 2010.

In 2011, Ashley and her children returned to Connecticut. On June 7, 2011, Ashley's adoptive sister, April, and her adoptive mother, Lorri, filed a petition with the Probate Court, seeking custody of the children and removal of the plaintiff and Ashley as guardians. They also asked the court to grant them temporary custody of the children. The petitioners alleged that Ashley was homeless and unable to care for her children, that she was "trying to run from the law" or expected to be arrested imminently, that she had asked them "to take" the children, and that she had "no intentions of taking [her] children back." They indicated that the plaintiff was incarcerated and, therefore, unable to care for the children.

On the basis of these representations, on June 8, 2011, the Probate Court granted immediate, temporary custody of the children to April and Lorri. However, the court found that it had insufficient information to determine the best interests of the children with respect to ongoing custody and guardianship. The court appointed an attorney for the children and, pursuant to General Statutes § 45a-619,[4] ordered DCF to conduct an investigation and to submit a report.

_____

[4] General Statutes § 45a-619 provides in relevant part: "In any proceeding under sections 45a-603 to 45a-624, inclusive . . . in which the probate judge has reason to believe that the minor may have been abused or neglected, the Court of Probate shall request the Commissioner of Children and Families or any organization, agency or individual licensed or approved by the commissioner, to make an investigation and written report to it . . . . The report shall indicate the physical, mental and emotional status of the minor and shall contain such facts as may be relevant to the court's determination of whether the proposed court action will be in the best interests of the minor, including the physical, social, mental, and financial condition of the parties, and such other factors which the commissioner or agency finds relevant to the court's determination of whether the proposed action will be in the best interests of the minor. . . ."

Jamie G. *v.* Dept. of Children & Families

The children's legal status remained in limbo through-out the following year.[5] In December, 2011, DCF submit-ted a report to the Probate Court, signed by a DCF social worker, her supervisor, and the DCF program manager, summarizing the investigation and recom-mendations. At that time, DCF referred only to April as the proposed guardian.

In its report, DCF did not find any new allegations of abuse or neglect while the children were in April's care. But DCF did express some concerns regarding April's then current housing situation. Although April and her own children had been living independently, in September, 2011, they moved in with April's parents, Lorri and George. In addition, although April initially denied it, she later admitted that her boyfriend, Christo-pher, also had moved into the family home in Plymouth (family home). George, Lorri, and Christopher each had significant child protective histories.

Ultimately, DCF found that, by virtue of the plaintiff's incarceration, he had failed to maintain a reasonable degree of responsibility for the children, and that, for various reasons, Ashley also had "failed to provide the care, guidance, or control necessary for her children's physical, educational and emotional well-being . . . ." Accordingly, DCF concluded that neither parent was an appropriate caretaker.

DCF further concluded that both children had "spe-cial needs due to developmental delays . . . [and that they were] in need of a stable, safe and appropriate home and caretaker, as well as consistency in their lives, in order for them to get the services that they need." DCF deemed April to be an appropriate care-taker because, among other things, she "has ensured

_____

[5] In July, 2011, the plaintiff notified the Probate Court that he had no objection to the appointment of the temporary guardians, but he requested that the children be allowed to visit him at the correctional facility.

Jamie G. *v.* Dept. of Children & Families

that the . . . mental health, physical and medical, as well as educational, needs [of Toni and Dominic] are being evaluated and addressed. . . . [She appears] to love and care for the children very much and to have a strong bond [with] them. [She] also appear[s] to be very proactive in regard to the children's needs and [is] making sure that the children are evaluated appropriately for their needs and are involved in the appropriate services . . . .'' Accordingly, despite its concerns about the housing situation, DCF recommended that the parents be removed as guardians and that April be appointed as guardian for both children.

The Probate Court, having received DCF's report and recommendations in December, 2011, scheduled a hearing on the petition for February 7, 2012. That hearing was rescheduled to March, 2012, because Ashley's attorney was unable to attend, and it was postponed again when the plaintiff, who recently had been released from prison, failed to appear for the March hearing.

On July 7, 2012, before a hearing could be held and while the Probate Court's initial temporary custody orders were still in effect, Toni wandered, unattended, outside the family home. Her body was discovered shortly thereafter in a neighbor's pond.

In 2013, the plaintiff filed a timely notice of claim with the claims commissioner, requesting permission to sue the state. The claims commissioner dismissed the claim in 2016. The plaintiff sought review by the legislature; see General Statutes (Rev. to 2017) § 4-158 (b); which, in 2017, vacated the decision of the claims commissioner and remanded the claim for a hearing on the merits. See Substitute House Joint Resolution No. 67, File No. 644 (March 31, 2017). Following an opportunity for the parties to conduct discovery, a magistrate judge who was authorized to assist the claims commissioner; see Public Acts 2016, No. 16-127, § 5;

Jamie G. *v.* Dept. of Children & Families

conducted a hearing in June, 2018. The following month, the magistrate recommended that the claims commissioner grant the plaintiff's request to sue the state. The claims commissioner accepted the magistrate's recommendation three years later, in September, 2021, and the plaintiff filed the present action in 2022.

The complaint alleges that DCF's negligence was the proximate cause of Toni's suffering and death. The allegations of negligence relate both to DCF's recommendations to the Probate Court regarding the children's best interests and to DCF's alleged failure to properly execute various independent duties to protect the children from abuse and neglect.

DCF moved to dismiss the action, contending that the trial court lacked subject matter jurisdiction because the state is entitled to absolute judicial or quasi-judicial immunity for its activities integral to the judicial process. In particular, DCF argued that all of its challenged actions were performed in the course of conducting a court-ordered investigation and issuing court-ordered recommendations. The trial court agreed with DCF's analysis and dismissed the action. The trial court concluded that the DCF workers (and, by extension, DCF and the state) were entitled to absolute quasi-judicial immunity while functioning as an arm of the Probate Court, that the claims commissioner cannot waive that immunity, and that "[t]he bare-boned negligence allegations of [the] complaint" were insufficient to overcome DCF's immunity.

The plaintiff timely appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. On appeal, the plaintiff contends that the trial court improperly dismissed the action because (1) the legislature has waived the state's quasi-judicial and sovereign immunities in this matter, and (2) even if DCF maintains

352 Conn. 736 AUGUST, 2025 745

Jamie G. *v.* Dept. of Children & Families

its quasi-judicial immunity, some of the allegations in the complaint exceed the scope of that immunity.

II

The plaintiff first argues that, under § 4-160, when the claims commissioner allows a private party to bring a legal action against a governmental agency of the state, such as DCF, the state waives not only its sovereign immunity, but also other common-law immunities, such as quasi-judicial immunity. Specifically, he argues that this waiver is evident in the following language of the statute: "the state waives its immunity from liability and from suit in each such action and waives all defenses which might arise from the eleemosynary or governmental nature of the activity complained of . . . ." General Statutes § 4-160 (h) (1). The plaintiff highlights the sweeping nature of the phrase "all defenses which might arise from," and he contends that quasi-judicial immunity, which, in this case, arises from DCF's support of the Probate Court, is quintessentially governmental in nature.[6] We are not persuaded that this language abrogates the common law such that it waives quasi-judicial immunity.

A

A colorable claim of "absolute immunity from suit . . . implicates [a trial] court's subject matter jurisdiction." *Deutsche Bank AG* v. *Vik*, 349 Conn. 120, 136, 314 A.3d 583 (2024). We review de novo a trial court's dismissal of an action based on a claim of absolute immunity. See, e.g., id., 136–37.

_____

[6] According to the plaintiff, the quintessential activities protected by the functional immunities—judging, legislating, and prosecuting—are all governmental in nature, insofar as they are public functions that ordinarily are performed by government officials. Judges, for example, are public officers, and many of the individuals who can avail themselves of quasi-judicial immunity either are themselves public employees or, if private individuals, qualify for immunity because they play an instrumental role in assisting judges and facilitating the state's judicial process.

Jamie G. *v.* Dept. of Children & Families

The plaintiff's claim that § 4-160 waives sovereign immunity as well as judicial or quasi-judicial immunity presents a question of statutory interpretation. Our analysis is guided by General Statutes § 1-2z and the "general rules of statutory construction . . . subject to a significant qualification." (Citations omitted.) *Bifolck* v. *Philip Morris, Inc.*, 324 Conn. 402, 447, 152 A.3d 1183 (2016); see also, e.g., id., 446–54 (discussing application of § 1-2z to statutes in derogation of common law). That is, where, as here, the claim is that the legislature has abrogated the common law, "[w]e recognize only those alterations of the common law that are clearly expressed in the language of the statute . . . . [We do so] because the traditional principles of justice [on] which the common law is founded should be perpetuated." (Internal quotation marks omitted.) *Vitanza* v. *Upjohn Co.*, 257 Conn. 365, 381–82, 778 A.2d 829 (2001). Indeed, it is well established that, "[w]hen a statute is in derogation of common law or creates a liability where formerly none existed, it should receive a strict construction and is not to be extended, modified, repealed or enlarged in its scope by the mechanics of [statutory] construction." (Internal quotation marks omitted.) *Caciopoli* v. *Lebowitz*, 309 Conn. 62, 70, 68 A.3d 1150 (2013).[7]

Common-law judicial and quasi-judicial immunities, like other common-law rules, are subject to this principle and will not be deemed to have been abrogated in the absence of a clear indication of legislative intent.

[7] One corollary of this rule is that, because statutes that waive the state's sovereign immunity do so "in derogation of the common law, [a]ny statutory waiver of immunity must be narrowly construed"; (internal quotation marks omitted) *Mahoney* v. *Lensink*, 213 Conn. 548, 555, 569 A.2d 518 (1990); "and its scope must be confined strictly to the extent the statute provides." (Internal quotation marks omitted.) *Escobar-Santana* v. *State*, 347 Conn. 601, 612, 298 A.3d 1222 (2023). Because the issue in the present case is whether § 4-160 (h), which waives the state's sovereign immunity, also encompasses a broader waiver of other common-law immunities, this principle helps to inform our analysis.

Jamie G. *v.* Dept. of Children & Families

See, e.g., *Cordero* v. *University of Connecticut Health Center*, 308 Conn. 215, 224–25, 61 A.3d 514 (2013); see also, e.g., *Rehberg* v. *Paulk*, 566 U.S. 356, 362, 132 S. Ct. 1497, 182 L. Ed. 2d 593 (2012) ("[United States Supreme Court] cases have proceeded on the assumption that common-law principles of . . . immunity were incorporated into our judicial system and that they should not be abrogated [in the absence of] clear legislative intent to do so" (internal quotation marks omitted)); *Pierson* v. *Ray*, 386 U.S. 547, 554–55, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967) (presuming that Congress would have clearly indicated its intent to abolish by statute legislative or judicial immunity); A. Olowofoyeku, Suing Judges: A Study of Judicial Immunity (Oxford University Press 1993) p. 163 ("the attitude adopted by the American courts to common-law immunities is that these immunities are applicable unless expressly abolished"). Accordingly, we begin our analysis with the common-law rules and then turn to the statute. See, e.g., *Bifolck* v. *Philip Morris*, *Inc.*, supra, 324 Conn. 447.

B

Both of the immunities at issue in this appeal, sovereign immunity and judicial immunity, rest on well established and long-standing legal principles with deep roots in Connecticut law. The principle of sovereign immunity—that the state cannot be sued without its consent—originates in ancient common law. E.g., *Marland* v. *University of Connecticut Health Center*, 350 Conn. 830, 835, 326 A.3d 1096 (2024). "Historically, the legislature of this state would grant compensation, through the enactment of special acts, to citizens who were injured or who had other claims against the state. Indeed, prior to 1959, before the legislature created . . . the claims commission, the General Assembly in the first instance considered what action, if any, was appropriate on claims made against the state. . . . [The predicate for waiving sovereign immunity and

Jamie G. *v.* Dept. of Children & Families

allowing suit against the state] was not that the state was liable for such compensation, but, rather, that justice and equity required that . . . the state respond to an action as if it were a private person.'' (Internal quotation marks omitted.) Id., 837–38. As we will further explain, this means that, after the state waives its right to assert its sovereign immunity, it remains free to assert both defenses to, and immunity from, liability ''as the general law recognizes.'' *Bergner* v. *State*, 144 Conn. 282, 286, 130 A.2d 293 (1957).

The doctrine of absolute judicial immunity also long predates § 4-160 and has its origins in English common law. See, e.g., *Khan* v. *Yale University*, 347 Conn. 1, 19–20, 295 A.3d 855 (2023). Judges, like legislators and prosecutors,[8] have long enjoyed their own traditional common-law immunities intended to shield them from the potentially chilling effects of threatened litigation.[9] See, e.g., *Gross* v. *Rell*, 304 Conn. 234, 246–47, 40 A.3d 240 (2012). In the case of judicial immunity, ''[i]t is well established that a judge may not be civilly sued for judicial acts he undertakes in his capacity as a judge.'' (Internal quotation marks omitted.) *Carrubba* v. *Moskowitz*, 274 Conn. 533, 540, 877 A.2d 773 (2005). ''If judges were personally liable for erroneous decisions, the resulting avalanche of suits, most of them frivolous but vexatious, would provide powerful incentives for judges to avoid rendering decisions likely to provoke

[8] Before the trial court, DCF argued that any of its alleged misconduct that was not subject to quasi-judicial immunity was nevertheless protected by prosecutorial immunity. Because the trial court concluded that all of the challenged actions were protected by quasi-judicial immunity, it did not address the issue of prosecutorial immunity. On remand, the trial court will have the opportunity to consider those arguments in the first instance.

[9] These officials, like all state officers and employees, now enjoy statutory immunity from personal liability for negligent conduct within the scope of their employment. See General Statutes § 4-165. Nevertheless, the common-law immunities continue to serve an indispensable purpose by shielding public officials from the intrusive and chilling effect of having their work and decision processes subjected to the scrutiny of discovery and litigation.

Jamie G. *v.* Dept. of Children & Families

such suits. . . . The resulting timidity would be hard to detect or control, and it would manifestly detract from independent and impartial adjudication.'' (Citation omitted.) *Forrester* v. *White*, 484 U.S. 219, 226–27, 108 S. Ct. 538, 98 L. Ed. 2d 555 (1988); see also, e.g., *Carrubba* v. *Moskowitz*, supra, 540 (''judicial immunity serves to promote principled and fearless decision-making by removing a judge's fear that unsatisfied litigants may hound him with litigation charging malice or corruption'' (internal quotation marks omitted)).

Importantly, ''[this] mantle of judicial immunity covers not only judges, but all adjuncts to the judicial process.'' *DeLaurentis* v. *New Haven*, 220 Conn. 225, 242, 597 A.2d 807 (1991). Still, ''[a]lthough we have extended judicial immunity to protect other officers in addition to judges, that . . . protection extends only to those who are intimately involved in the judicial process . . . .'' (Internal quotation marks omitted.) *Gross* v. *Rell*, supra, 304 Conn. 246–47. We have used the term ''quasi-judicial immunity'' to refer to the judicial immunity enjoyed both by these individuals who are so instrumental to the judicial process as to be considered an arm of the court; see, e.g., id., 247–48; and by individuals who play an essential role in certain adjudicatory settings outside of the formal judicial context, such as administrative tribunals. See, e.g., *Khan* v. *Yale University*, supra, 347 Conn. 19–20.

In addition to judges and law clerks, it is well established that certain private individuals enjoy the protection of judicial or quasi-judicial immunity. See, e.g., *Gross* v. *Rell*, supra, 304 Conn. 246–48. Indeed, private individuals, such as court-appointed social workers, court-appointed psychologists, and guardians ad litem, are entitled to judicial or quasi-judicial immunity when functioning as an arm of the court. See, e.g., id., 248, 258; see also part III of this opinion (describing functional approach to be followed in assessing claims of immunity).

Jamie G. *v.* Dept. of Children & Families

Applying these principles, the trial court in this case concluded that, notwithstanding the claims commissioner's waiver of sovereign immunity, DCF, operating through a social worker and her supervisors, was entitled to absolute quasi-judicial immunity for acts that were authorized or approved by the Probate Court. The plaintiff challenges this conclusion on appeal. He argues that, as a matter of statutory interpretation, the state's waiver of its sovereign immunity also waives related immunities, such as quasi-judicial immunity.[10]

C

As we explained in part II A of this opinion, the plaintiff bears a heavy burden. He must establish that the legislature, in drafting § 4-160, clearly evinced its intent to abolish common-law judicial and quasi-judicial immunities, in addition to waiving the state's sovereign immunity. With these principles in mind, we turn to the statute at issue, § 4-160. Subsections (a), (d) and (h) of that statute are relevant to the parties' dispute.

Subsection (a) of § 4-160 provides in relevant part: "Whenever the Claims Commissioner deems it just and equitable, the Claims Commissioner . . . may authorize suit against the state on any claim which, in the opinion of the Claims Commissioner, presents an issue of law or fact under which the state, *were it a private person*, could be liable. . . . The state may file an opposition . . . based solely on jurisdictional grounds . . . or prosecutorial, judicial, quasi-judicial or legislative immunity." (Emphasis added.)

Subsection (d) (1) of § 4-160, which sets forth a procedure by which a special deputy may assist the claims commissioner in assessing claims against the state, likewise provides in relevant part: "If a claim is referred

___

[10] In part III of this opinion, we address the plaintiff's alternative argument that, even if the state did not waive its quasi-judicial immunity, not all of DCF's allegedly negligent conduct falls within the ambit of that immunity.

Jamie G. *v.* Dept. of Children & Families

to a special deputy . . . such special deputy shall review the notice of claim . . . [and] the state's notice of opposition . . . . Consideration of the state's opposition to such claims shall be limited to jurisdictional grounds or prosecutorial, judicial, quasi-judicial or legislative immunity. . . . A special deputy shall authorize suit against the state if the claim, in the opinion of the special deputy, presents an issue of law or fact under which the state, *were it a private person*, could be liable. If the resolution of the state's opposition to the claim is based on a dispute of a material fact, the special deputy shall grant permission to sue the state and preserve the state's right to pursue such defense in court.'' (Emphasis added.)

Consistent with the "private person" standard set forth in subsections (a) and (d), subsection (h) of § 4-160 details the implications that flow from a decision to authorize a suit against the state. Section 4-160 (h) provides in relevant part: "In each action authorized by the Claims Commissioner . . . [e]xcept as provided in subsection (d) of this section, (1) the state waives its immunity from liability and from suit in each such action and *waives all defenses* which might arise from the eleemosynary or *governmental nature* of the activity complained of, and (2) the rights and liability of the state in each such action shall be coextensive with and *shall equal the rights and liability of private persons in like circumstances*.'' (Emphasis added.)

Three conclusions flow from this statutory language, each of which is inimical, if not fatal, to the plaintiff's position. First, under § 4-160, the state "stands in the same shoes as a private person tortfeasor . . . .'' *Cordero* v. *State*, Docket No. CV-09-5030511-S, 2010 WL 4885344, *2 (Conn. Super. November 8, 2010). It subjects itself to suit in those circumstances under which a private person could be liable, but it also retains the same rights as any private defendant. We must read the

Jamie G. *v.* Dept. of Children & Families

statute as a whole and interpret subsection (h) (2) of § 4-160 in light of the "private person" language. See, e.g., *Manginelli* v. *Regency House of Wallingford, Inc.*, 347 Conn. 581, 598, 298 A.3d 263 (2023) ("[w]e construe a statute as a whole and read its subsections concurrently in order to reach a reasonable overall interpretation" (internal quotation marks omitted)). As we discussed, and will elaborate in part III of this opinion, quasi-judicial immunity is not limited to public officers and employees. A private social worker who is commissioned by a court to investigate and advise in a child custody matter may be entitled to quasi-judicial immunity and will not be personally liable to the extent that his or her actions are shielded by that immunity. Thus, the "private person" language used throughout § 4-160 suggests that DCF and its employees retain those same rights and limits to liability. Indeed, if they did not, the statute would have the perverse effect of exposing the state to *greater* liability than a private party and would incentivize courts to rely on private, rather than public, entities for assistance. That would be flatly inconsistent with the statutory language.

Second, this court previously has recognized that "[t]he sole purpose of § 4-160 . . . is to remove the bar of sovereign immunity when the claims commissioner determines that it would be 'just and equitable' to permit a claimant to seek redress against the state." *Chotkowski* v. *State*, 240 Conn. 246, 270, 690 A.2d 368 (1997). As we discussed, judicial immunity is a fundamentally different type of immunity, one with origins, purpose, and constitutional status distinct from those of sovereign immunity. We consider it implausible that the legislature intended to authorize the claims commissioner, or the claims commissioner's deputies, to abrogate this long-standing and vital immunity by burying such a seismic legal change[11] in a vaguely worded provision

_____

[11] The plaintiff has failed to identify a single instance, in this state or nationally, in which a legislature has enacted a blanket waiver of judicial

Jamie G. *v.* Dept. of Children & Families

in the middle of subsection (h) of § 4-160. See, e.g., *Tenney* v. *Brandhove*, 341 U.S. 367, 376, 71 S. Ct. 783, 95 L. Ed. 1019 (1951) ("[w]e cannot believe that Congress . . . would impinge on a tradition so [well-grounded] in history and reason by covert inclusion in the general language before us"); *In re Sundance Corp., Inc.*, 149 B.R. 641, 660 (Bankr. E.D. Wn. 1993) (in absence of language clearly and unambiguously waiving judicial immunity, court will assume that "Congress simply didn't consider this" issue). Rather, it seems clear from the language and structure of the statute that the legislature sees functional immunities from suit, such as judicial and quasi-judicial immunities, as fundamentally distinct from sovereign immunity. Whereas the latter is waived whenever the claims commissioner deems it just and equitable to permit a claimant to sue the state, other traditional immunities from suit, along with other jurisdictional claims, are not waived under the current version of the statute.

Third, and relatedly, the statute leaves open the opportunity for the state to pursue claims of judicial and quasi-judicial immunities in the trial court. See General Statutes § 4-160 (d) (1). The fact that the state retains

---

or quasi-judicial immunity. Indeed, such a waiver would appear to be unprecedented. See, e.g., 4 Restatement (Second), Torts § 895B (3), p. 400 (1979) ("[e]ven when a [s]tate is subject to tort liability, it and its governmental agencies are immune to the liability for acts and omissions constituting . . . the exercise of a judicial . . . function"); id., comment (c), pp. 402–403 (general immunity to liability also applies to quasi-judicial conduct); W. Keeton et al., Prosser and Keeton on the Law of Torts (5th Ed. 1984) § 131, p. 1046 ("[e]ven where the sovereign immunity of the state has been abolished, a . . . judicial immunity is retained to protect against liability for . . . judicial decisions"); see also, e.g., 28 U.S.C. § 2674 (2018) (subjecting United States to tort liability "in the same manner and to the same extent as a private individual under like circumstances" but clarifying that "the United States shall be entitled to assert any defense based upon judicial . . . immunity which otherwise would have been available"). Nor has the plaintiff identified a single case in which our legislature has permitted any individual party to hold the state liable in tort because that party was dissatisfied with the outcome of a judicial ruling.

Jamie G. *v.* Dept. of Children & Families

the right to litigate its common-law immunities even after the claims commissioner waives sovereign immunity is incompatible with the plaintiff's theory that the waiver of sovereign immunity operates to waive these other immunities as well.

In short, the plaintiff's interpretation of § 4-160 is inconsistent with (1) the well established purpose of the statute, which is merely to set forth the rules by which the claims commissioner waives sovereign immunity and grants permission to sue the state, and (2) the text of the broader statute, which allows the state to retain any defenses and immunities available to a private defendant and expressly permits the state to preserve the right to assert its common-law immunities, even after the claims commissioner waives sovereign immunity.[12]

D

Even if we were to conclude that the statutory language is ambiguous, however, DCF would still prevail. First, as discussed, we will narrowly construe a statute in derogation of the common law. This principle of construction militates against broadly construing the waiver contemplated by § 4-160 to encompass not only sovereign immunity, but all other common-law immunities from suit.

Second, there are constitutional reasons why we do not lightly assume that the legislature has chosen to infringe on the traditional immunities fashioned by the judiciary to safeguard the essential character and function of the judicial branch of government. As we explained, those immunities have long been seen as

―――――――――

[12] Because we reject the plaintiff's reading of the statute on other grounds, we need not consider DCF's argument that the legal distinction between defenses and immunities means that § 4-160 (h) (1), which waives only *defenses*, leaves the state free to assert claims of judicial and quasi-judicial *immunities*.

Jamie G. *v.* Dept. of Children & Families

essential to the proper, independent functioning and integrity of the judicial process. See, e.g., *DeLaurentis* v. *New Haven*, supra, 220 Conn. 241 ("The judge on the bench must be free to administer the law under the protection of the law, independently and freely, without fear of consequences. No such independence could exist if he were in daily apprehension of having an action brought against him, and his administration of justice submitted to the opinion of a jury. . . . Were he not immune, no man but a beggar or a fool would be a judge . . . because in every suit there is a loser eager to avenge his loss, and in every unsuccessful prosecution there is an accused eager to exact a penalty for his ordeal." (Citations omitted; internal quotation marks omitted.)); see also, e.g., *Carrubba* v. *Moskowitz*, supra, 274 Conn. 541–42 (immunities protect individuals who perform actions or functions that are "integral to the judicial process"). Although we see no obvious reason why legislators could not opt to waive their own legislative immunities (except to the extent that those immunities are constitutionally conferred), a statute purporting to abridge judicial immunities "would raise serious constitutional questions under the separation of powers doctrine." *Wheelabrator Bridgeport, L.P.* v. *Bridgeport*, 320 Conn. 332, 382, 133 A.3d 402 (2016). Whenever possible, we must construe statutes to avoid those potential constitutional infirmities. See, e.g., id.; see also, e.g., *In re Sundance Corp., Inc.*, supra, 149 B.R. 660 (court observed that language in statute did "not clearly and unequivocally waive federal judicial immunity" and concluded that, "in the absence of specific language to this effect, [it must decline] to interpret the statute as creating a serious constitutional conflict involving Congress' power to waive judicial immunity with its detrimental impact on judicial independence").

Third, to the extent that it is appropriate to consult the legislative history of the statute in a case such as

Jamie G. *v.* Dept. of Children & Families

this; see, e.g., *Envirotest Systems Corp.* v. *Commissioner of Motor Vehicles*, 293 Conn. 382, 399–400, 978 A.2d 49 (2009) (*Katz, J.*, concurring); id., 406 (*Palmer, J.*, concurring);[13] we would conclude that the history supports DCF's interpretation of § 4-160. The legislative history of the original 1959 statute; see General Statutes (Supp. 1959) § 4-160; provides no insight into the intent of the legislature with respect to the governmental defenses language. In 2021, however, the legislature added language to the statute specifically addressing "prosecutorial, judicial, quasi-judicial or legislative immunity." Public Acts 2021, No. 21-91, § 6 (P.A. 21-91); see also General Statutes § 4-160 (a) and (d) (1). The amendments provide that the state is not barred from raising those defenses before the claims commissioner or a "temporary deputy"[14] and that, at least under some circumstances, the defenses can be reserved and raised before the trial court. P.A. 21-91, § 6; see also General Statutes § 4-160 (d) (1) ("[i]f the resolution of the state's opposition to the claim is based on a dispute of a material fact, the special deputy shall grant permission to sue the state and preserve the state's right to pursue [a prosecutorial, judicial, quasi-judicial or legislative immunity] defense in court").

This new language supports DCF's position, insofar as the fact that the state can retain the right to pursue a functional immunity defense in court after the claims

---

[13] In *Envirotest Systems Corp.* v. *Commissioner of Motor Vehicles*, supra, 293 Conn. 382, a majority of the court determined that, when the common law requires a clear indication of legislative intent, a failure by the legislature to include such a clear indication of legislative intent is dispositive, and there is no reason to consult extratextual sources to resolve any statutory ambiguities. See id., 388–391. Both concurring justices, by contrast, concluded that legislative history properly may be consulted in such circumstances, consistent with § 1-2z. See id., 399–400 (*Katz, J.*, concurring); id., 406 (*Palmer, J.*, concurring).

[14] Public Acts 2024, No. 24-44, § 12, made a technical change by substituting the term "special deputy" for the term "temporary deputy" throughout § 4-160.

Jamie G. *v.* Dept. of Children & Families

commissioner or a temporary deputy has authorized suit against the state suggests that such defenses are not automatically waived in tandem with sovereign immunity. In addition, the history of the 2021 amendments provides some illumination. The original version of the proposed 2021 amendments did not reference the functional immunities, providing only that "[a]ny notice of opposition . . . shall be limited to opposition of the claim based solely on jurisdictional grounds." Raised Bill No. 6506, 2021 Sess., § 3. Attorney General William Tong expressed concerns before the Judiciary Committee that the proposed amendments, as initially drafted, might preclude the state from raising functional immunity defenses before the claims commissioner,[15] as permitted by existing practice,[16] creating "a massive influx of cases into the judicial system."[17] In accordance

---

[15] See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2021 Sess., p. 6157, written testimony of Attorney General Tong (arguing that "[a] certificate of merit system would preclude the [s]tate from raising valid defenses, (e.g. recreational use of land, judicial, quasi-judicial, prosecutorial and other immunities), and create a massive influx of cases into the judicial system").

[16] See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2021 Sess., p. 6031, remarks of Representative Craig Fishbein (noting concern that bill "would impede the Attorney General's Office from asserting certain defenses at the [claims commissioner level] that are legitimate and are in conformance with the current process").

[17] Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2021 Sess., p. 6157, written testimony of Attorney General Tong.

In addition, attorneys testifying before the Judiciary Committee sought to reassure members that the goal of the bill was simply to bypass the lengthy discovery process and factual hearings on the merits, which were duplicative of the process that would ensue in the Superior Court, and to allow all colorable claims to proceed. See id., pp. 6031–44. The witnesses, some of whom had been involved in the drafting of the legislation, offered assurances during the hearings that the bill would not bar the state from raising functional immunity defenses either before the claims commissioner or in the Superior Court. See id.; see also id., pp. 6031–32, remarks of Representative Craig Fishbein; id., pp. 6031–32, remarks of Attorney Lincoln Woodard (testifying that "[m]any of the jurisdictional issues are protected by being able to be raised in the Superior Court" and that "[t]he [b]ill is not designed to [alter] that process" or "to eliminate those jurisdictional defenses").

Jamie G. *v.* Dept. of Children & Families

with Attorney General Tong's testimony, the legislature amended the bill, adding express references to the functional immunities. This left no doubt that the state can raise those immunities before the claims commissioner and need not wait and engage in the more resource intensive process of litigating those claims in the Superior Court. The legislative history, then, supports DCF's view that, prior to the passage of the 2021 amendments, the state could raise a defense of quasi-judicial immunity even after the claims commissioner had authorized suit against the state and that the state retained that right following the passage of the 2021 amendments.

E

This analysis leaves open one question. If the "prosecutorial, judicial, quasi-judicial or legislative immunity" referenced in § 4-160 does not qualify as a defense that "might arise from the eleemosynary or governmental nature of the activity complained of," then what sorts of defenses did the legislature have in mind? After all, we "must construe [the statute] if possible, such that no clause, sentence or word shall be superfluous, void or insignificant . . . ." (Internal quotation marks omitted.) *State* v. *King*, 346 Conn. 238, 260, 288 A.3d 995 (2023). DCF posits that the only defenses that are waived when the state consents to suit are those that are *inherently* governmental, that is to say, those that are essentially extensions of the state's sovereign immunity and that could never be raised by a private defendant. But DCF offers no theory or example of what such an inherently governmental defense (let alone an eleemosynary defense) might look like.

One set of likely suspects could be found, we believe, in the years immediately preceding the original enactment of § 4-160 in 1959. In 1957, as the legislature was in the process of considering and preparing the legislation that would create the Office of the Claims Commis-

352 Conn. 736 AUGUST, 2025 759

Jamie G. *v.* Dept. of Children & Families

sion,[18] this court addressed the question of whether, after the legislature waives the state's sovereign immunity and grants a claimant permission to sue, the state remains free to raise a defense of "governmental immunity" from liability.[19] *Bergner* v. *State*, supra, 144 Conn. 283–84. *Bergner* answered that question in the negative, with this court concluding that a necessary corollary of the decision to waive sovereign immunity from suit in a specific case is that the legislature waives governmental immunity from liability as well. See id., 287–89; see also id., 287 (explaining that legislature's decision to authorize suit would be "utterly useless and meaningless" if state could nevertheless claim governmental immunity from liability). The legislature is presumed to have been aware of *Bergner* and other contemporaneous decisions of this court addressing the closely related public duty doctrine; see footnote 20 of this opinion; and it is reasonable to assume that they informed the drafting process and that the language at issue in § 4-160 merely represented the legislature's decision to codify the holding of this court's recently

_____

[18] See, e.g., Conn. Joint Standing Committee Hearings, Appropriations, Pt. 3, 1959 Sess., p. 920, remarks of George Oberst, director of the legislative council (legislature directed legislative council to study issue in 1953, received report of legislative council and prepared necessary constitutional amendment in 1955, and submitted amendment to electorate for approval in 1958).

[19] The term "governmental immunity" traditionally has been limited to claims of immunity by municipalities and other subdivisions of the state. It is unclear whether the state's claim of "governmental immunity" in *Bergner* was simply an attempt to argue that immunity from *liability* may survive a waiver of immunity from *suit*, or whether the state intended to invoke some distinct immunity, such as that conferred by the public duty doctrine. See, e.g., *Gordon* v. *Bridgeport Housing Authority*, 208 Conn. 161, 166, 544 A.2d 1185 (1988) (opining that this court first articulated public duty doctrine in *Leger* v. *Kelley*, 142 Conn. 585, 589–90, 116 A.2d 429 (1955)); see also, e.g., *Torres* v. *Dept. of Correction*, 50 Conn. Supp. 72, 79–85, 912 A.2d 1132 (2006) (tracing history of public duty doctrine and concluding that this doctrine is type of defense, governmental in nature, envisioned by § 4-160, as it applies only to public duties exercised by public officials and, therefore, that it is waived in tandem with state's sovereign immunity).

Jamie G. *v.* Dept. of Children & Families

decided *Bergner* case. See, e.g., *Carpenter* v. *Daar*, 346 Conn. 80, 111, 287 A.3d 1027 (2023) (legislature is presumed to be aware of this court's decisions when it acts); see also, e.g., *Cohen* v. *General Hospital Society of Connecticut*, 113 Conn. 188, 190–91, 199, 154 A. 435 (1931) (rejecting argument that eleemosynary corporation was entitled to immunity from liability because it performed governmental charitable function).

It is reasonable to conclude, then, that the primary purpose of the statutory scheme is to establish procedures by which the state can waive its *sovereign* immunity. If a legal action could proceed against a private party, it ought not be barred simply because the defendant happens to be the state, and, thus, once the claims commissioner authorizes suit against the state, the state is precluded from raising any defense—from suit or liability—that is founded solely on its special status as the sovereign. But we can discern no legislative intent also to waive specific immunities that are essential to carrying out key public duties, including those undertaken as part of the judicial process, even when the immunities could be raised by a private defendant and are not included within the scope of sovereign immunity. The plain language of § 4-160 unambiguously puts the state in the same position as a private person once sovereign immunity is waived, and, at that juncture, the state retains all the rights and liabilities of a private person. In order to construe the statute as a harmonious whole, to avoid serious constitutional problems, and to properly apply the requirements for statutes in derogation of the common law, we must strictly construe the "all defenses" language contained in § 4-160 (h) (1) to apply only to defenses such as governmental immunity, the public duty doctrine, and related eleemosynary defenses.

F

In summary, § 4-160 places the state in the shoes of a private defendant. Subsection (h) of § 4-160 provides

352 Conn. 736        AUGUST, 2025              761
<br />Jamie G. *v.* Dept. of Children & Families

that a decision by the claims commissioner to authorize suit against the state waives the state's sovereign immunity from suit, as well as any related defenses that derive from the state's sovereign status. The statute does not waive common-law defenses, such as quasi-judicial immunity, that are not inherently governmental and that could be raised in like circumstances by a private party.

To adopt the plaintiff's broader reading of the statutory waiver, by contrast, would require us to conclude that the claims commissioner has been delegated an unprecedented authority—to permit discontented parties to sue the state for, among other things, damages on the basis of allegations that a judge erroneously issued (or failed to issue) a ruling, causing harm to a claimant (for example, by admitting a piece of evidence or imposing a certain sentence)—and that the commissioner's waiver would not be subject to review either by the courts or by the legislature itself. The Office of the Claims Commissioner has long eschewed such authority,[20] and, in light of the serious constitutional concerns implicated were we to construe § 4-160 in this manner, we reject the plaintiff's proposed construction in the absence of a clear and unambiguous statement of legislative intent making the construction unavoidable. For these reasons, we agree with the conclusion of the trial court that a waiver of sovereign immunity by the claims commissioner does not bar the state from arguing before the court that it nevertheless is shielded by quasi-judicial immunity.

[20] See, e.g., *In re Rondeau*, Office of the Claims Commissioner, Claim No. 20140 (March 1, 2006) ("The [c]ommissioner has consistently held that the doctrine of absolute judicial immunity applies to shield the [s]tate from liability in instances where claims have been related to injuries or losses suffered where an order issued by a judicial authority is implicated. This is so even if the action complained of was accomplished or initiated by an agent or arm of the [c]ourt as long as a sufficient nexus existed between the act or initiative and a lawful judicial proceeding. [See *In re Phelps*, Office of the Claims Commissioner, Claim No. 16859 (June 18, 1997); *In re Doe*, Office of the Claims Commissioner, Claim No. 15650 (1996)].").

Jamie G. *v.* Dept. of Children & Families

### III

In the alternative, the plaintiff argues that, even if the claims commissioner lacks the authority to waive DCF's absolute quasi-judicial immunity, and even if certain acts that DCF employees performed at the direction of the Probate Court in the present case were shielded by that immunity, the trial court should not have dismissed the action in its entirety. The plaintiff contends that at least some of the negligent conduct alleged in the complaint may not have been undertaken by DCF as an arm of the Probate Court and may have involved the performance of legal duties independent of those carried out at the direction of the court pursuant to § 45a-619. We are persuaded.

### A

The following additional procedural history is relevant to this claim. In paragraph 15 of the complaint, the plaintiff alleges that DCF was negligent in one or more of the following ways:

"a. in that it failed to conduct an adequate and appropriate investigation;

"b. in that it failed to reopen and/or initiate a new investigation and/or family treatment plan;

"c. in that it caused, allowed, and/or permitted [Toni] to remain at the [family] home . . . when it knew, or in the exercise of reasonable care should have known, that it constituted a danger to [Toni];

"d. in that it failed to adequately supervise, train, and/ or instruct said placement;

"e. in that it failed to follow up on and act [on] documented information about claims of neglect;

"f. in that it failed to remove [Toni] from [the family] home when it knew or should have known of the dangers that existed;

352 Conn. 736 AUGUST, 2025 763

Jamie G. *v.* Dept. of Children & Families

"g. in that it failed to adequately [ensure] the safety and supervision of [Toni];

"h. in that it failed to follow its own policies and procedures;

"i. in that it failed to adequately train, supervise and/ or oversee its employees, including social workers;

"j. in that it failed to respond to potential abuse and/ or neglect;

"k. in that it recommended, permitted and/or acquiesced to the placement of Toni in a dwelling with members of a household with DCF histories [that] includ[ed] multiple instances of substantiation of neglect and sexual abuse;

"*l.* in that it failed to recognize the risks associated with one or more of the foregoing; and

"m. in that it failed to follow safe and effective policies and procedures associated with Toni's placement."

In support of its motion to dismiss, DCF argued that all of these claims should be dismissed for lack of subject matter jurisdiction because they arose in the context of an investigation that was integrally related to a judicial proceeding and was performed at the direction of the Probate Court. In his opposition to the motion to dismiss, the plaintiff argued that the allegations of negligence in the complaint are not limited to the tasks that DCF performed at the direction of the Probate Court, namely, investigating and making recommendations regarding Toni's placement in the family home. The trial court acknowledged the plaintiff's argument that certain allegations in the complaint are not subject to absolute quasi-judicial immunity, but the court did not directly address that argument in its memorandum of decision. The plaintiff subsequently filed a motion for reargument or reconsideration, contending that the

Jamie G. *v.* Dept. of Children & Families

trial court did not address his allegations of negligence that are separate and distinct from DCF's report to the Probate Court. The trial court denied the motion, without further elaboration.

The plaintiff renews the argument on appeal.[21] He specifically directs our attention to the recommendation of the magistrate judge to the claims commissioner. That recommendation states that, at the hearing before the magistrate, the parties gave conflicting testimony as to one material fact: "According to [the plaintiff], approximately two weeks before Toni's death, he was driving to the [family home] for a visit with her. As he was driving up the street, he saw Toni, approximately 200 yards from the . . . property, in a neighbor's yard. He picked her up, brought her back to the [family home], and told Lorri . . . where he had found Toni. [Lorri] said she did not realize Toni was gone. [The plaintiff] testified that he then called the DCF caseworker and reported the incident, and was told by the worker that she would call the [family]. The caseworker testified that [the plaintiff] never called her."[22]

B

The following well established principles govern our resolution of this claim. "[I]n general our cases have followed a functional approach to immunity law."

---

[21] DCF claims that the plaintiff waived these arguments by failing to adequately present them in his principal appellate brief. We need not determine whether the claim was adequately briefed at the outset because, after the issue arose at oral argument before this court, we ordered the parties to submit supplemental briefs "addressing whether there are any allegations in the plaintiff's complaint . . . that are not subject to the defense of quasi-judicial immunity."

[22] The plaintiff apparently did not enter the hearing transcripts into the record before the trial court. DCF has moved to strike that portion of the plaintiff's supplemental brief that relies on the findings and recommendations of the magistrate judge. We consider those findings and recommendations only to the extent that they shed further light on the nature of the plaintiff's (as yet unproven) allegations.

352 Conn. 736 AUGUST, 2025 765

Jamie G. *v.* Dept. of Children & Families

(Internal quotation marks omitted.) *Gross* v. *Rell*, supra, 304 Conn. 249. That is to say, "[a]bsolute immunity flows not from rank or title or location within the [g]overnment . . . but from the nature of the responsibilities of the individual official." (Internal quotation marks omitted.) Id. Absolute quasi-judicial immunity, for example, "extends only to those who are intimately involved in the judicial process . . . . [E]ven judges are not entitled to immunity for their administrative actions, but only for their judicial actions." (Internal quotation marks omitted.) Id., 247.

Under this functional approach, we apply a three factor test to determine whether a person should be afforded absolute immunity. Id., 248. We ask "[1] whether the official in question perform[s] functions sufficiently comparable to those of officials who have traditionally been afforded absolute immunity at common law . . . [2] whether the likelihood of harassment or intimidation by personal liability [is] sufficiently great to interfere with the official's performance of his or her duties . . . [and] [3] whether procedural safeguards [exist] in the system that would adequately protect against [improper] conduct by the official." (Internal quotation marks omitted.) Id., 248–49.

C

As a general matter, we agree with DCF that, under this three factor test, social workers—whether private sector or public employees—are entitled to quasi-judicial immunity for their acts and omissions[23] to the extent that they are operating under the direction of the Probate Court and assisting that court in carrying out the quintessentially judicial task of assessing the best inter-

---

[23] It is well established that the *failure* to act also can be subject to absolute judicial or quasi-judicial immunity when the decision whether to act is instrumental to the judicial process. See, e.g., *Phelps* v. *Sill*, 1 Day (Conn.) 315, 329 (1804).

Jamie G. *v.* Dept. of Children & Families

est of a child. With respect to the first factor, in *Gross*
v. *Rell*, supra, 304 Conn. 234, we explained that a court-
appointed conservator was entitled to absolute judicial
immunity when he or she acts as an agent under the
supervision and control of the Probate Court. See id.,
250–53. The same reasoning applies to social workers
who conduct court-ordered investigations. "[T]heir
function is not merely *comparable* to those of officials
who have traditionally been afforded absolute immunity
at common law . . . . [R]ather, they function *as* the
Probate Court." (Citation omitted; emphasis in original;
internal quotation marks omitted.) Id., 252; see also,
e.g., *Carrubba* v. *Moskowitz*, supra, 274 Conn. 537, 544
(court-appointed attorney for minor child, like guardian
ad litem, is entitled to absolute quasi-judicial immunity
for performance of functions that are integral to judicial
process, such as making reports and recommendations
as to best interest of child).

With respect to the second factor, we agree with the
trial court that "[c]ircumstances such as those [in this
case] present an even stronger case for quasi-judicial
immunity than the circumstances involving court-appointed
conservators. To deny immunity to . . . DCF social
worker[s] would make them a litigation lightning rod
for parties disgruntled with a judicial order based on
their report. Ensuring the DCF social worker is covered
by quasi-judicial immunity while functioning as the Pro-
bate Court ensures that court's fearless and principled
decision-making." (Footnote omitted; internal quota-
tion marks omitted.) See, e.g., *Ammar I.* v. *Dept. of
Children & Families*, 351 Conn. 656, 672, 332 A.3d 180
(2025) ("[f]ailing to apply the litigation privilege [to
DCF's] actions taken in connection with a termination
of parental rights proceeding would hamper [its] mis-
sion to protect children who are abused, neglected, or
uncared for . . . out of fear of future retaliatory litiga-
tion by disgruntled parents" (citation omitted)); *Car-*

Jamie G. *v.* Dept. of Children & Families

*rubba* v. *Moskowitz*, supra, 274 Conn. 543 ("the threat of litigation from a disgruntled parent, unhappy with the position advocated by the attorney for the minor child in a custody action, would be likely . . . to interfere with the independent [decision-making] required by this position").

Turning to the third factor, we have recognized with respect to related positions, such as guardians ad litem and attorneys for the minor child, that the threat of litigation is not necessary to incentivize professional conduct and that "sufficient procedural safeguards [exist] in the system to protect against improper conduct . . . ." *Carrubba* v. *Moskowitz*, supra, 274 Conn. 543. In *Carrubba*, for example, we concluded that adequate safeguards were in place because an attorney for the minor child who was appointed by the court could also be removed by the court and was subject to discipline for violations of the Rules of Professional Conduct. Id. Similarly, professionals appointed by the Probate Court to serve as investigators are subject to the court's removal, and decisions of the court itself are subject to the normal appellate process.

At the same time, every social worker, whether employed in the public or private sector, has certain independent obligations, such as to report suspected child abuse and neglect encountered in the ordinary course of his or her employment. See General Statutes § 17a-101 et seq. And DCF has its own distinct statutory obligations with respect to at-risk children. See, e.g., General Statutes § 17a-3 (duty to provide preventative services, clinically indicated placements and services, and outreach and assistance to persons caring for children); General Statutes § 17a-101g (depending on seriousness and immediacy of risk to child, DCF may have duty to conduct timely investigation, to submit referral for family assessment and services, to refer case to local

Jamie G. *v.* Dept. of Children & Families

law enforcement, or to remove child for up to ninety-six hours).

At oral argument before this court and in its supplemental brief, DCF acknowledged that, if, in the course of carrying out a court-ordered investigation, it became aware that a child was being abused or neglected, and the agency did not act to secure the child's safety, its failure to act would not be shielded by absolute judicial immunity. See, e.g., *Gross* v. *Rell*, supra, 304 Conn. 253–54 (conservators do not have absolute immunity with respect to acts not authorized or approved by Probate Court). The undeveloped state of the record, in tandem with the conclusory nature of many of the plaintiff's allegations, makes it difficult, at this stage in the proceedings, to determine as a matter of law which of DCF's allegedly negligent actions and omissions are shielded by absolute quasi-judicial immunity because they were instrumental to DCF's work as an arm of the Probate Court, and which ones implicate alleged violations of DCF's independent duties.

Some of the allegations clearly fall within the scope of quasi-judicial immunity as a matter of law. For example, the allegations that DCF failed to conduct an adequate and appropriate investigation and that it negligently recommended that Toni remain in April's custody directly challenge DCF's performance of the specific task delegated to it by the Probate Court, namely, to independently and objectively assess the best interest of the child in this matter.[24]

Other allegations likely would not be subject to a claim of quasi-judicial immunity. These include the allegations that DCF failed to follow up and act on docu-

---

[24] Because we conclude that these activities were protected by quasi-judicial immunity, we need not consider DCF's alternative argument that they also were protected by the litigation privilege. See, e.g., *Ammar I.* v. *Dept. of Children & Families*, supra, 351 Conn. 665–66, 671–72, 676–78.

Jamie G. *v.* Dept. of Children & Families

mented claims of neglect (such as the plaintiff's alleged report that Toni had wandered off unnoticed two weeks before her death) and that DCF failed to take the necessary steps to remove Toni from the family home once the serious risks of remaining there became apparent. If, in the ordinary course of business, DCF received a credible report that a child was being neglected or was at serious risk of abuse or neglect, it would be legally obligated to follow up on that report and, potentially, to take action up to and including removal of the child. The fact that DCF happened to be performing an investigation at the behest of the Probate Court when it received such reports or became aware of such risks does not obviate any independent duty to secure the child's safety.[25]

For most of the plaintiff's allegations, however, the nature of the claim is not sufficiently clear, and the record is not sufficiently developed, for us to say, at this juncture, whether absolute quasi-judicial immunity applies. Many of the claims, such as those alleging inadequate training and failure to follow established procedures, might relate to either category of claims, and the particular procedures and standards at issue are not a matter of record. On remand, it will fall to the trial court to make those determinations in the first instance once an adequate record has been established. Given that any surviving claims ultimately would be tried to the trial court; see General Statutes § 4-160 (k); it also

---

[25] We emphasize that we express no opinion as to the factual or legal merits of the plaintiff's claims that fall outside the scope of quasi-judicial immunity. As the record currently stands, the allegations that underlie those claims appear to be limited to (1) the contested charge that DCF received, and failed to timely respond to, a single report that Toni had, on one occasion, wandered unattended into a neighbor's yard, and (2) the uncontested fact, which DCF reported to the Probate Court, that several members of the household had abused or neglected other children, in most instances, more than one decade earlier. Our holding is limited to our determination that not all of the plaintiff's allegations, if substantiated, would be shielded by absolute quasi-judicial immunity from suit.

Jamie G. *v.* Dept. of Children & Families

will fall to that court to determine whether to hold additional hearings on DCF's motion to dismiss to establish the necessary jurisdictional facts, or to defer those factual determinations to trial. See, e.g., *Graham* v. *Commissioner of Transportation*, 330 Conn. 400, 428 n.14, 195 A.3d 664 (2018).

The judgment is reversed as to any allegations in the complaint that are not subject to quasi-judicial immunity as a matter of law and the case is remanded for further proceedings according to law; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.